Charles SILAGY, Petitioner–Appellee, Cross–Appellant,

v.

Howard PETERS, III, Warden, Pontiac Correctional Center, Respondent–Appellant, Cross–Appellee.

Nos. 89–2129, 89–2212 and 89–3117.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 31, 1990.

Decided May 2, 1990.

As Amended July 6, 1990.

As Amended on Denial of Rehearing and Rehearing En Banc July 10, 1990.

Timothy M. Gabrielsen, Patricia G. Mysza, Office of the State Appellate Defender, Springfield, Ill., for Charles Silagy.

Neil F. Hartigan, Atty. Gen., Jack Donatelli, Asst. Atty. Gen., Chicago, Ill., for Howard Peters, III.

Terri L. Mascherin, Jenner & Block, Randolph N. Stone, Robert P. Isaacson, Office of the Public Defender of Cook County, Chicago, Ill., David J. Bradford, James P. Bailinson, Niles, Ill., for amicus curiae Office of the Cook County Public Defender and MacArthur Justice Center.

Kimball R. Anderson, Winston & Strawn, Chicago, Ill., for amicus curiae National Legal Aid and Defender Ass'n.

John P. Buckley, Chicago, Ill., for amicus curiae Illinois Attorneys for Criminal Justice.

Before COFFEY, EASTERBROOK and KANNE, Circuit Judges.

KANNE, Circuit Judge.

During the early morning hours of February 14, 1980, the body of Cheryl Block, the girlfriend of Petitioner, Charles Silagy, and that of Anne Budde–Waters were discovered in two separate locations in Vermillion County, Illinois. Each had been stabbed repeatedly and had died as a result of massive hemorrhaging caused by those stab wounds.

In a confession made to the police several days later, Silagy stated that he and Miss Block had been in an argument as they were driving from a local night club to another bar. Silagy recounted that he began to choke Miss Block during the course of this argument. He continued:

My truck done a spin-around, and killed itself, and I shut it off and started chokin' her some more, and kept chokin' her and a car come up from the south, and so I acted like we was makin' out, and the car was all clear, and I commenced chokin' her with my left hand, and then I decided I didn't have enough room ... so I fought with the door for a little bit, and I got it open from outside, ... because it will not open from the inside. Had to crank the window down and all this time I still got a hold of her throat. And chokin' her. And so I throwed her out on the ground and I got outta the truck, and I started a-stompin' on her and jumpin' up and down, and on her head, and then I drug her across the road, and she was still breathin', so I took out my pocket knife and opened it and pulled her coat and blouse away, and stabbed her approximately five or six times in the chest on the left-hand side and then I left her lay there, and went back and got into my truck and left.

After that had occurred, Petitioner went back to the apartment which he shared with Miss Block and Miss Budde–Waters to wash his hands and face. Shortly thereafter, Miss Budde–Waters arrived back at the apartment and refused to leave. As a response, Petitioner stated that he:

threw her over toward the TV, ... and I, ... threwed her down, and her head hit the coffee table, and I went over, and kicked her a couple o' times in the head. And then I proceeded to go to a drawer, to where ... the big knives and butcher knives and utensils were kept.... And picked me out a knife that I knew would not bend, and I went back over and snatched her blouse on the left side, and yanked it back, and stabbed her four times continuously in the chest.

These confessions led to Petitioner's prosecution and conviction for these murders. The same Illinois jury which found him guilty subsequently sentenced him to death under the provisions of the Illinois death penalty statute, Ill.Ann.Stat. ch. 38, ¶ 9–1(d) (Smith Hurd 1979). The Supreme Court of Illinois affirmed Petitioner's conviction and sentence. *People v. Silagy*, 101 Ill.2d 147, 77 Ill.Dec. 792, 461 N.E.2d 415, *cert. denied*, 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984). Silagy subsequently filed a petition for post-conviction relief which was dismissed by the trial court. This dismissal was affirmed by the Illinois

Supreme Court in *People v. Silagy,* 116 Ill.2d 357, 107 Ill.Dec. 677, 507 N.E.2d 830, *cert. denied,* 484 U.S. 873, 108 S.Ct. 212, 98 L.Ed.2d 163 (1987). Thereafter, he filed a petition for rehearing in the United States Supreme Court. This petition was denied. *Silagy v. Illinois,* 484 U.S. 972, 108 S.Ct. 476, 98 L.Ed.2d 413 (1987). In November of 1988, Silagy filed a petition for writ of habeas corpus in the United States District Court for the Central District of Illinois. In this petition, he raised various issues as to the propriety of both his conviction and sentence. The district court denied Petitioner's challenges to his conviction, but issued a writ to vacate the sentence of death based on its conclusion that the Illinois death penalty statute was violative of the sixth, eighth and fourteenth amendments. *United States ex rel. Silagy v. Peters,* 713 F.Supp. 1246 (C.D.Ill.1989). Both Silagy and the State appeal from this final decision.

## I.

The primary issue which we must address is the constitutionality of the Illinois death penalty statute. The district court's conclusion that the Illinois death penalty statute is unconstitutional was based almost exclusively on the rationale of the dissenting opinion in *People ex rel. Carey v. Cousins,* 77 Ill.2d 531, 34 Ill.Dec. 137, 397 N.E.2d 809 (1979), *cert. denied,* 445 U.S. 953, 100 S.Ct. 1603, 63 L.Ed.2d 788 (1980). That dissent concluded that the Illinois statute's grant of prosecutorial discretion under § 9–1(d) to request a separate sentencing hearing was violative of the eighth amendment's guarantee against the "arbitrary and capricious" imposition of the death penalty. In addition, the dissent concluded, although without much explication, that the statute's failure to provide pretrial notice to an accused that the death penalty will be sought in his case was violative of basic notions of due process. *Id.* 34 Ill.Dec. at 151–52, 397 N.E.2d at 823–24.[1] The district court adopted these conclusions as its own in its final order.

Although not expressly stated in its holding, it appears that the district court further concluded that this lack of pretrial notice also implicates the sixth amendment right to "effective assistance of counsel." Finally, while not a basis for the district court's decision, Petitioner argues that the Illinois statute is unconstitutional in that the impact of its provisions is to raise a rebuttable presumption in favor of the imposition of the death penalty in violation of the eighth amendment.

We must also address various issues which Silagy raises in support of his prayer that this court reverse his conviction. We will discuss both the factual bases and the substance of those issues as they arise in the course of our review.

### A. FACIAL ATTACK ON ILLINOIS STATUTE

Petitioner's attack on the constitutionality of the Illinois statute is both "facial" and "as applied." With regard to the argument that the Illinois statute is unconstitutional on its face, Petitioner's shotgun approach raises three arguments of consequence. First, he argues that the discretion afforded the prosecutor under § 9–1(d) of the statute in deciding whether to seek the death penalty in a particular case violates the eighth amendment's guarantee against "cruel and unusual punishment." Second, Petitioner argues that the Illinois statute's failure to notify the accused prior to trial that the death penalty will be sought in his case violates both the sixth amendment right to effective assistance of counsel and the fourteenth amendment right to due process. Finally, Petitioner argues that the Illinois statute is unconstitutional in that the practical effect of its § 9–1(g) is to establish a rebuttable presumption in favor of the death penalty in violation of the eighth amendment.

### 1. Prosecutorial Discretion under § 9–1(d)

Petitioner's initial eighth amendment concern focuses on the discretion afforded

---

1. This stance as to the constitutionality of the Illinois death penalty statute was subsequently adopted by the dissent in *People v. Lewis,* 88 Ill.2d 129, 179, 58 Ill.Dec. 895, 430 N.E.2d 1346, 1370 (1981), *cert. denied,* 456 U.S. 1011, 102 S.Ct. 2307, 73 L.Ed.2d 1308 (1982).

Illinois prosecutors under § 9–1(d) of the statute to request a separate sentencing hearing to consider the potential imposition of a death sentence for a convicted defendant.[2] Neither § 9–1(d), nor any other section of the Illinois death penalty statute, provide for express legislative guidelines to assist the prosecutor in determining under what circumstances to request a separate sentencing hearing. Moreover, under the Illinois scheme a prosecutor need not make such a request until a conviction has been obtained. Categorizing this prosecutorial discretion as within the realm of post-conviction sentencing discretion which served as the focus of the Court's concern in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) and its progeny, Petitioner argues that the failure of the Illinois statute to provide legislative guidelines to assist the prosecutor in exercising this discretion violates the eighth amendment. We do not agree.

In assessing Petitioner's claim, it is necessary to examine the Supreme Court's eighth amendment jurisprudence and, in so doing, focus on the Court's concerns · as they are presented in those decisions. The Court's decision in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), serves as the foundation of our analysis. The issue presented to the Court in *Furman* was whether "the imposition and carrying out of the death penalty in [the cases before the court] · constitute[d] cruel and unusual punishment in violation of the eighth and fourteenth amendments." *Id.* at 239, 92 S.Ct. at 2727. While this issue was not resolved by the various concurring opinions presented in that decision, the Court later recognized in *Gregg v. Georgia, supra,* that the residue of those concurring opinions was that, because of the uniqueness of the death penalty as a

form of sentence, it could not be imposed under circumstances which presented a substantial risk that it would be inflicted in an "arbitrary or capricious manner." 428 U.S. at 188, 96 S.Ct. at 2932. The Court further noted that the mandate of *Furman* was that any discretion afforded a sentencing body in imposing the death penalty must be narrowly channeled so as to minimize the risk of arbitrariness and capriciousness. *Id.* at 189, 96 S.Ct. at 2932. This mandate has guided the Court's subsequent death penalty jurisprudence.

Four years after the decision in *Furman,* the Court considered the eighth amendment issues posed by five post-*Furman* death penalty statutes. In each of these cases, the Court's decision as to whether the statute was unconstitutional turned on the nature of the "sentencing procedures" prescribed by the particular statute and the extent to which those procedures focused the sentencing authority's attention on the particularized nature of the crime and the particularized characteristics of each defendant.[3]

The first of these cases was *Gregg v. Georgia, supra,* in which the Court upheld the constitutionality of the Georgia death penalty statute. Under the scheme as it existed in Georgia in 1976, the class of murderers eligible for capital punishment was narrowed through the statute's specification of ten statutory aggravating circumstances, one of which must have been determined by the jury to exist beyond a reasonable doubt before a death sentence could be imposed. Georgia Code Ann. § 27–2534.1 (Supp.1975). In addition, the jury was authorized to consider any appropriate aggravating or mitigating circumstances. § 27–2534.1(b). Believing that these procedural requirements would assure that the jury's attention would be

---

**2.** Section 9–1(d) provides in part:

Where requested by the State, the court shall conduct a separate sentencing proceeding to determine the existence of factors set forth in subsection (b) and to consider any aggravating or mitigating factors as indicated in subsection (c).

**3.** As Chief Justice Burger later pointed out in *Lockett v. Ohio,* 438 U.S. 586, 601, 98 S.Ct. 2954,

2963, 57 L.Ed.2d 973 (1978), the disposition of each of these cases turned upon the votes of three Justices who delivered a joint opinion in each ·of the five cases. For the purpose of clarity, we note that when we refer to "decisions of the Court" in discussing these five cases, our reference is to that joint opinion, delivered by ·Justices Stewart, Powell, and Stevens.

focused "on the particularized nature of the crime and the particularized characteristics of the individual defendant", the Court concluded that the jury's discretion was adequately channeled and, more importantly, that the concerns which prompted the Court's decision in *Furman* were not present under the Georgia statute. *Gregg*, 428 U.S. at 206–07, 96 S.Ct. at 2941.

The Court's decision upholding the Texas death penalty statute in *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), was premised on the same fundamental concern. Under the capital sentencing scheme in force in Texas, once a defendant had been convicted of a capital crime the sentencing procedure required that the jury be presented with three questions in a post-conviction sentencing hearing. Tex. Code Crim.Proc., Art. 37.071 (Supp.1975–76). If the jury found that the state had proved beyond a reasonable doubt that the answer to each of the three questions was "yes", the death penalty was to be imposed. Art. 37.071(c). Thus, the issue presented to the Court was whether the jury, in answering these three questions, was permitted to consider all of the mitigating and aggravating circumstances surrounding the defendant and his crime. Concluding that the Texas capital sentencing procedure "guides and focuses the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence", the Court determined that the Texas statute was not violative of the eighth and fourteenth amendments. *Jurek*, 428 U.S. at 274, 96 S.Ct. at 2957–58.

In *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), the Court upheld the constitutionality of the Florida capital sentencing procedure. Under the Florida statute, once a defendant was found guilty of a capital offense, a separate evidentiary hearing would be conducted before the jury to determine whether the death penalty should be imposed. Based upon its consideration of the mitigating and aggravating evidence presented during this evidentiary hearing, the jury would render an "advisory opinion" as to whether the death penalty should be imposed. Fla.Stat.Ann. §§ 921.141(2)(b) and (c) (Supp.1976–77). The final decision regarding the imposition of the death sentence in each case would be made by the trial judge, who could impose the death sentence only after making a written finding that the mitigating circumstances were insufficient to outweigh the aggravating circumstances. § 921.141(3). The Court found that the procedures employed in Florida satisfied the constitutional deficiencies identified in *Furman*, stating:

> [t]he sentencing authority in Florida, the trial judge, is directed to weigh eight aggravating circumstances against seven mitigating factors to determine whether the death penalty shall be imposed. This determination requires the trial judge to focus on the circumstances of the crime and the character of the individual defendant.

*Proffitt*, 428 U.S. at 251, 96 S.Ct. at 2966.[4]

A recent pronouncement on eighth amendment concerns in the death penalty context came in *Penry v. Lynaugh*, 492 U.S. ——, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). In ruling that the Texas death penalty statute, as applied to the facts of that case, was unconstitutional in prohibiting the jury from giving effect to all of the mitigating evidence surrounding the individual defendant, the Court reaffirmed its reliance on the principles established in *Furman* and its progeny. The Court stated:

> [i]n order to ensure 'reliability in the determination that death is the appropri-

---

**4.** In two additional cases, *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) and *Roberts v. Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), the Court declared unconstitutional the North Carolina and Louisiana death penalty statutes which, in each instance, called for a "mandatory death penalty" whenever a defendant was convicted of first degree murder. As part of its rationale in these cases, the Court relied on the fact that the mandatory nature of these statutes did not permit the sentencing authority to consider the relevant aspects of the crime and the individual nature of the defendant. *Woodson*, 428 U.S. at 303–04, 96 S.Ct. at 2991; *Roberts*, 428 U.S. at 334–36, 96 S.Ct. at 3006–07.

ate punishment in a specific case', *Woodson*, 428 U.S. at 305, 96 S.Ct. at 2991, the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background, character, or the circumstances of the crime. *Id.* at —, 109 S.Ct. at 2951.

■ The fundamental issue posed by Silagy in this context, therefore, is whether the post-conviction discretion exercised by a prosecutor under § 9–1(d) of the Illinois statute properly falls within that category of "sentencing discretion" which has served as the focus of the Court's concern. We do not believe that it does. The concern of the Court has been to limit and channel the discretion of the sentencing body—i.e., the judge or the jury—which actually *imposes* the sentence in a given case. *See Pulley v. Harris*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984) (In discussing *Gregg* and subsequent cases, the Court focused its attention on the extent to which the state statutory systems directed and limited the jury's discretion). A prosecutor's decision under § 9–1(d) of the Illinois statute to commence or forego a death sentence hearing is not a decision to "impose" the death sentence.[5] Rather, the prosecutor's role is limited to that of initiating the proceedings.

The concerns addressed by the Court in *Furman* and its progeny with regard to limiting the discretion of the "sentencing authority" simply do not come into play under the Illinois statute until after the prosecutor has requested a separate sentencing hearing and the formal sentencing procedures have commenced. As such, the fact that the Illinois statute does not provide for legislative guidelines to assist the prosecutor in exercising his discretion does not implicate the Court's eighth amendment concerns.

Petitioner argues, however, that the fact that Illinois prosecutors are permitted to exercise this discretion "post-conviction" differentiates the Illinois statute from those that have been considered by the Court and, as a consequence, renders it violative of the eighth and fourteenth amendments. We agree that the Illinois statute is unique from other state's statutes that have been addressed in this respect, but we do not believe that this uniqueness is of constitutional dimension.

An Illinois prosecutor exercises the same fundamental discretionary authority under § 9–1(d) as do prosecutors in other states that have death penalty statutes. Specifically, the prosecutor determines in each case whether the crime committed by the defendant makes him eligible for a capital sentence. Under the Illinois statute, this determination necessarily focuses the prosecutor's attention on § 9–1(b) of the statute which lists eight "aggravating factors" pertaining to the crime, one of which must be proved beyond a reasonable doubt by the State before the imposition of the death sentence may even be considered by the jury. This is substantially the same decision which is presented to a prosecutor who, under the Georgia death penalty statute for example, must determine—pretrial at the indictment stage—whether a capital crime will be charged. Under the Georgia scheme as it existed at the time of *Gregg*, the prosecutor was guided by a list of six categories of crimes for which the death penalty could be imposed. In deciding whether or not to charge a capital crime, a Georgia prosecutor necessarily considered whether any of those six crimes could be proved beyond a reasonable doubt to the jury. Thus, the two schemes are substantially the same in that the prosecutor's decision to seek the death penalty is guided in each instance by his assessment of the

---

**5.** Contrary to Petitioner's argument and the position adopted by the dissent in *People ex rel. Carey v. Cousins*, a prosecutor's post-conviction exercise of discretion under the Illinois statute does not amount to a "judicial function." This fact is pointed out by the dissent's recognition in *Cousins* that "the imposition of a criminal sentence is a judicial function." 34 Ill.Dec. at 818, 397 N.E.2d at 818. Under the Illinois statute,

the prosecutor does not "impose" the sentence simply by requesting a separate sentencing hearing. Rather, as under other state's death penalty procedures, the imposition of the sentence is left to the judge or jury after careful consideration of the aggravating and mitigating circumstances surrounding the crime and the individual defendant.

possibility of proving a specific element of the crime beyond a reasonable doubt. Based on this fact, we fail to see how the timing of this prosecutorial decision implicates eighth amendment concerns.

Indeed, rather than jeopardizing the integrity of the death sentencing procedure, we believe that the Illinois statute's grant of post-conviction discretion may enhance the quality of prosecutorial decisions in this regard in that it permits the prosecutor to weigh all of the evidence presented in the guilt/innocence stage of the proceedings in his assessment of the propriety of seeking the death penalty in that particular case.[6] Thus, like the sentencing authority's ultimate decision to impose the death penalty, the prosecutor's preliminary decision to seek the death sentence in a particular case will be guided not only by the nature of the crime itself, but also by any individualized characteristics of the defendant which may come out during the course of the trial. For all of these reasons, we reject Petitioner's eighth amendment challenge to the constitutionality of the Illinois death penalty statute.

### 2. Lack of Pretrial Notice

■ Petitioner's sixth amendment claim focuses on the right to "effective assistance of counsel" and the extent to which the Illinois death penalty statute protects that right. In this regard, the Supreme Court has recognized that the right to "effective assistance of counsel" protects a criminal defendant not only from "actual ineffectiveness" of counsel, but also from circumstances in which prejudice to a defense counsel's ability to effectively represent may be presumed. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Our task is to determine whether the lack of a pretrial notice provision in the Illinois statute interferes with defense counsel's ability to pro-

vide effective representation to such a degree that ineffective assistance can be presumed. We do not believe that it does.

Our resolution of this issue follows from the Supreme Court's decision in *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). In *Cronic*, the Court was asked to consider, in the absence of evidence of actual ineffectiveness on the part of trial counsel, when state interference with defense counsel's ability to conduct an effective defense may be presumed to be violative of the sixth amendment. The Court concluded that in certain circumstances a presumption of ineffectiveness may arise. *See Henderson v. Thieret*, 859 F.2d 492, 499 (7th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1648, 104 L.Ed.2d 163 (1989); *United States v. Moreno Morales*, 815 F.2d 725, 752 & n. 33 (1st Cir.), *cert. denied,* 484 U.S. 966, 108 S.Ct. 458, 98 L.Ed.2d 397 (1987). Specifically, the Court noted that a presumption of ineffectiveness arises when there is "a complete denial of counsel," or if "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Cronic*, 466 U.S. at 659, 104 S.Ct. at 2047. Petitioner's claim must necessarily proceed under the third of the Court's recognized scenarios—i.e., "when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate...." *Id.* at 659–60, 104 S.Ct. at 2047. We do not believe that pretrial knowledge regarding the certainty of a request for the death penalty is necessary to protect this sixth amendment concern.

In an attempt to focus Silagy's argument in this regard and properly frame the issue, it is necessary to point out that defense counsel is not completely without notice as

---

**6.** We do not accept Petitioner's assertion that a prosecutor's decision at this stage of the proceedings will be tainted by any "caprice and emotion" which may have developed during the course of the trial. As the Court stated in *McClesky v. Kemp,* 481 U.S. 279, 313, 107 S.Ct. 1756, 1778, 95 L.Ed.2d 262 (1987), "[w]here the discretion that is fundamental to our criminal

process is involved, we decline to assume that what is unexplained is invidious." *See also Gregg,* 428 U.S. at 225, 96 S.Ct. at 2949 ("absent facts to the contrary it cannot be assumed that prosecutors will be motivated in their charging decision by factors other than the likelihood that a jury would impose the death penalty if it convicts") (White, J., concurring).

to the possibility of a death sentence under the Illinois death penalty scheme. On the contrary, the fact that a particular defendant is eligible for a death sentence and the fact that the State may choose to seek a death sentence in that defendant's case are made known to defense attorneys as early as the filing of the indictment. Moreover, defense counsel is reminded of this possibility up through the time of voir dire.[7] In light of the existence of this "constructive notice", the issue is not whether an absolute lack of notice violates the sixth amendment's guarantee of effective assistance of counsel. Rather, we must determine to what extent the sixth amendment's guarantee of effective assistance of counsel mandates that defense counsel know to a certainty prior to trial that the State intends to pursue the death penalty in a given case. In our discussion, we refer to this latter type of knowledge as "certain pretrial knowledge."

Certain pretrial knowledge is not required to protect a defendant's sixth amendment rights. This conclusion is not premised upon an insensitive application of the rather amorphous principles surrounding what constitutes "effective assistance of counsel." Rather, we note, as did the Court in *Cronic*, 466 U.S. at 658, 104 S.Ct. at 2046, that the sixth amendment's guarantee of effective assistance of counsel is not valued for its own sake, but rather for an accused individual's ability to receive a fair trial. *See Hammonds v. Newsome*, 816 F.2d 611, 613 (11th Cir.1987). We do not believe that Petitioner received an unfair trial. Nor do we agree with Silagy's assertion that the only circumstance under which a death-eligible defendant can receive a fair trial is when he knows to a certainty from the outset that the State intends to seek the death penalty in his case.

Petitioner's argument that he received an unfair trial is premised primarily on his decision to pursue the insanity defense and the nature of the evidence which came into the trial as a result of that decision. Specifically, Silagy argues that if he had known to a certainty that the State intended to seek the death penalty in his case, he may have foregone the insanity defense at trial and, in so doing, avoided presenting to the jury certain inflammatory evidence necessary for that defense. Petitioner's argument, however, fails to comport with reality. Although not dispositive of our decision today, we note initially that the circumstances surrounding Petitioner's crime left him with no practical choice but to plead insanity. The record shows that Petitioner voluntarily confessed to the murder of both victims shortly after the commission of the crimes. Thus, defense counsel's argument that he might have foregone the insanity defense had he had certain pretrial knowledge that the State would pursue the death penalty is without merit. More fundamental to Petitioner's argument, however, is the claim that damaging evidence was presented during trial which he would have liked to have kept from the jury's consideration during the sentencing phase. Silagy's argument, however, fails to take cognizance of the fact that this evidence would have been introduced during the sentencing phase regardless of whether it was admitted during the trial itself.[8] Thus, Petitioner's lack of certain pretrial knowledge did not prejudice him in his presentation of his defense at trial.

On a more encompassing level, we hesitate to conclude that the assurance of a fair trial for all death eligible defendants

---

7. The indictment for murder in Illinois will direct a defense counsel's attention to § 9–1 of the Illinois Criminal Code which contains both the elements of the offense of murder and the statutory provisions governing death sentencing proceedings. In addition, defense counsel will be apprised during voir dire of the fact that the defendant is eligible for the death penalty in that he will be granted extra peremptory challenges as part of the process of "death-qualifying" the jury.

8. Under § 9–1(e) of the Illinois death penalty statute, any information relevant to non-statutory aggravating factors or any mitigating factors presented in subsection (c) may be introduced by the State or the defendant regardless of their admissibility under the rules governing the admission of evidence at trial.

mandates that the accused be given "certain pretrial knowledge" that the State intends to seek the death penalty in his case. Simply put, such knowledge is not essential for the purposes of the sixth amendment. Regardless of what type of notice is given an accused that the state intends to seek the death penalty in his case, the fact remains that the State's ultimate (i.e., binding) decision to pursue or forego the death penalty is not made until after the trial. Even in those states in which a prosecutor is required to indicate in pretrial pleadings that the state intends to seek the death penalty, the nature of the evidence presented at trial may convince the prosecutor that the imposition of the death penalty would not be appropriate in that case. Under such a circumstance, the prosecutor must be able to withdraw his earlier request for the imposition of the death penalty. Under that factual scenario, would a petitioner then be able to raise a sixth amendment claim arguing that if he had known that the state was *not* going to pursue the death penalty in his case, he may have opted for a different trial strategy? Or, to put it differently, if "certain pretrial knowledge" is constitutionally mandated under the sixth amendment, how could a prosecutor who has indicated that the State will pursue the death penalty in a particular case subsequently withdraw that request without creating an automatic appealable issue under the sixth amendment? Under the rule which Petitioner proposes, we do not believe that he could.

In addition to creating this untenable constitutional dilemma for prosecutors in capital cases, we find such a rule unwarranted in that it would only serve to restrict the otherwise informed manner in which a prosecutor under the Illinois statute is permitted to analyze the evidence presented at trial before deciding whether it may be appropriate to pursue the death penalty in a particular case. Were we to adopt a rule mandating "certain pretrial knowledge", prosecutors would be required to commit one way or another on the issue of whether to pursue the death penalty without the added insight into the individual characteristics of the defendant and the circumstances of the crime which the trial provides. For these reasons, we reject Silagy's argument that the sixth amendment mandates that in all instances "certain pretrial knowledge" be afforded to the accused.

■ Petitioner's fourteenth amendment argument, like his sixth amendment claim, focuses on the failure of the Illinois statute to grant a defendant pretrial notice that the State intends to seek the death penalty in his case. This aspect of Silagy's claim, however, asserts that this failure constitutes a deprivation of procedural due process. In that the Illinois statute does provide actual notice to a death-eligible defendant that the State intends to seek the death penalty and, thereafter, mandates that a separate sentencing hearing be conducted to determine the propriety of such a constitutional deprivation, we conclude that the Illinois statute provides for all the process which is due under the fourteenth amendment.

The sentencing authority's decision to *impose* a sentence of death under the Illinois statute clearly requires notice to the accused. As was noted in a different context by the Court in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950), a "fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." (citations omitted); *see also Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) (the fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner). The question presented by Petitioner's fourteenth amendment claim is whether procedural due process mandates that the accused be given pretrial notice of a State's intent to *seek* the death penalty in a particular case. We do not believe that it

does.[9]

The Supreme Court has recognized that, " '[D]ue process is flexible and calls for such procedural protections as the particular situation demands.' " *Mathews*, 424 U.S. at 334, 96 S.Ct. at 902 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). In determining what due process a particular situation may demand, the Court has indicated that three factors must be considered: (1) the private interest that will be affected by the official action; (2) the risk of erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional safeguards; and, (3) the government's interest. *Id.* 424 U.S. at 335, 96 S.Ct. at 903. Obviously, the private interest at stake under Petitioner's claim, and that of any other death-eligible defendant, is of the greatest magnitude. In light of the notice and procedural safeguards which are provided under the Illinois statute, however, we do not believe that any risk of erroneous deprivation which might exist mandates the adoption of Petitioner's proposed additional procedural safeguard. Nor do we believe that the imposition of such an additional procedural safeguard would serve to enhance the already ample opportunity which a death-eligible defendant is given to respond to the State's decision to seek the death penalty via the statutorily-mandated death sentencing hearing.

The State action which must be guided by procedural due process is the ultimate decision of the jury (or judge) to impose the sentence of death. For due process purposes, we distinguish this decision from that made by the prosecutor to seek or forego the death penalty hearing in that, unlike the decision of the judge or jury to impose a sentence of death, a prosecutor's decision to seek the death penalty in a particular case does not constitute a deprivation of life, liberty or property. The deprivation occurs, if at all, only through the action of the judge or jury at the con-

clusion of the statutorily-mandated sentencing hearing. The sentencing hearing mandated by the Illinois statute, we conclude, provides for all the procedure which is due under the fourteenth amendment.

Under the Illinois statute, if the State wishes to pursue a death penalty in a particular case it must request a separate sentencing hearing which will be conducted either before the jury that determined the defendant's guilt, a separately impanelled jury, or the court. § 9–1(d). This sentencing hearing is conducted for the purpose of permitting the sentencing authority to determine the existence of any aggravating or mitigating circumstances relating to the individual defendant or crime and to weigh those factors in determining whether the defendant in question should receive the sentence of death. §§ 9–1(c) and (g). Information relevant to any non-statutory aggravating factors or any mitigating factors presented in subsection (c) may be presented by the State or the defendant at the sentencing hearing, regardless of any evidentiary obstacles which might obstruct the admission of that information at trial. § 9–1(e). Finally, the Illinois statute provides for automatic review of any conviction and sentence of death by the Illinois Supreme Court. In sum, the defendant is notified, albeit post-conviction, that the State intends to seek the death penalty in his case. Thereafter, a series of procedural safeguards ensure that the defendant is given a meaningful opportunity to respond to the State's request for the imposition of the death penalty. Based on the notice and opportunity to respond which is afforded, we reject Petitioner's claim that the Illinois statute violates the due process concerns of the fourteenth amendment.

### 3. Rebuttable Presumption in Favor of Death Penalty

■ As yet another basis for finding the Illinois statute unconstitutional on its face, Petitioner argues that the impact of

---

9. The argument presented on behalf of Petitioner by *amicus curiae* that the failure to provide pretrial notice impacts the ability of a death-eligible defendant to effectively make strategical

decisions during the course of the trial necessarily falls within Petitioner's earlier sixth amendment argument and our resolution of that issue.

§ 9–1(g) of the Illinois statute is to create a mandatory rebuttable presumption in favor of the death penalty which impermissibly shifts the burden of persuasion to the capital defendant to show that the death penalty is inappropriate in his case. Section 9–1(g) of the statute spells out for the sentencing authority the results which will obtain depending on the balance struck between the aggravating and mitigating factors which are presented during the course of the sentencing hearing. It provides in pertinent part:

If the jury determines unanimously that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the court shall sentence the defendant to death.

Unless the jury unanimously finds that there are no mitigating factors sufficient to preclude the imposition of the death sentence the court shall sentence the defendant to a term of imprisonment. . . .

This statutory provision does not place an unconstitutional burden of persuasion on the defendant in a sentencing hearing to prove the inappropriateness of the death sentence in his or her case. Rather, this language in a constitutional way guides the jury (or judge) in determining under what circumstances the death penalty should be imposed. As the Court stated in *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976), a State's imposition of the death penalty does not comport with the guarantees of the eighth amendment unless the sentencing authority considers "the character and record of the individual offender and the circumstances of the particular offense. . . ." The Illinois statute's mandate that the jury (or judge) consider any mitigating and aggravating circumstances regarding the individual defendant and the particular crime serves to ensure that these eighth amendment rights are observed. Section 9–1(g), simply provides a balance upon which the sentencing authority can place the various mitigating and aggravating circumstances to determine whether the imposition of the death penalty is appropriate in a particular case.

Under § 9–1(g), the prosecution bears the initial burden of persuasion in the balancing stage of the sentencing proceeding. As the Illinois Supreme Court stated in the recent case of *People v. Bean*, —— Ill.2d —— (April 18, 1990, No. 65062), "the State is the movant, the party seeking the death penalty, and so it bears the primary burden of persuading the jury that, as the statute states, there are no mitigating factors sufficient to preclude the sentencer from imposing the sentence of death for which the defendant is eligible." —— Ill.2d at ——, slip op. at 52. The Illinois Supreme Court went on to say that because the sentencing determination is "a process of balancing intangibles, not of proving facts, it is improper to speak of defendants as having a 'burden.' After the State as movant has attempted to persuade the jury the death sentence should be imposed, a defendant may attempt to dissuade the jury from doing so. Whether the defendant attempts to dissuade the jury, whether he decides to take up this 'burden,' is up to him; the law does not require him to take it up." *Id.* Thus, we agree with the Illinois Supreme Court that where a defendant attempts to persuade the jury that the death penalty is inappropriate in his case, "a burden of persuasion is placed on the defendant by the sentencing statute. . . ." —— Ill.2d at ——, slip op. at 51. However, we also agree with the Illinois Supreme Court that the imposition of such a burden of persuasion on a defendant "is constitutional because at this point in the hearing the prosecution has already proven beyond a reasonable doubt that a statutory aggravating factor exists making the defendant eligible for the death penalty [citation omitted], and the jury is now weighing aggravating and mitigating factors presented by both the State and defendant." *Id.* As the Illinois Supreme Court noted, this kind of capital sentencing procedure which specifies a class of murderers who are eligible for the death penalty and provides for consideration of mitigating factors unique to the offense and offender has been approved by the Supreme Court in *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929

(1976); *see also, Walton v. Arizona,* ——
U.S. ——, ——, 110 S.Ct. 3047, ——, 111
L.Ed.2d 511 (1990) ("So long as a State's
method of allocating the burdens of proof
does not lessen the State's burden to prove
every element of the offense charged, or in
this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing
on him the burden of proving mitigating
circumstances sufficiently substantial to
call for leniency").

A statutory scheme which calls for a
particular body, such as the sentencing authority under § 9–1(g), to weigh various
factors must guide that body as to the
results which follow from a determination
that one set of factors outweighs the other.
If no such guidance were given, the weighing process itself would be rendered ineffective as a means of arriving at similar
results in similar situations. For example,
if a jury were asked to weigh various mitigating and aggravating circumstances in a
particular defendant's case, but were not
given any guidance as to the sentence
which must be imposed based upon the
balance they strike between those competing considerations, there would be no
means of preventing a jury from imposing
a death sentence even in those situations in
which the mitigating circumstances outweighed the aggravating circumstances.
Certainly, such a statutory scheme would
run afoul of the eighth amendment's guarantee that the death penalty not be imposed in an "arbitrary or capricious" manner. By providing for a certain result
based on the balance struck by the jury
between the aggravating and mitigating
circumstances, § 9–1(g) does not impose a
burden of persuasion on the defendant.
Rather, it serves to ensure that similar
results will be achieved in similar circumstances while, at the same time, allowing
the jury to consider the individual characteristics of the defendant and the particularized nature of the crime. For these
reasons, we reject Petitioner's argument
that § 9–1(g) violates either the eighth or
fourteenth amendments.

In a closely related argument under
the eighth amendment, Petitioner argues
that the impact of § 9–1(g) is to preclude
the sentencer from determining, based on
the individual characteristics of the defendant and the unique circumstances of the
crime, whether death is the appropriate
penalty in his case. Specifically, Petitioner
argues that § 9–1(g) denies the sentencer
the choice not to impose the death penalty
in certain circumstances.

Arguments substantially similar to this
aspect of Petitioner's challenge to the Illinois statute were recently addressed and
rejected by the Supreme Court in *Blystone
v. Pennsylvania,* 495 U.S. ——, 110 S.Ct.
1078, 108 L.Ed.2d 255 (1990) and *Boyde v.
California,* 495 U.S. ——, 110 S.Ct. 1190,
108 L.Ed.2d 316 (1990). At issue in *Blystone* was the constitutionality of
§ 9711c(1)(iv) of the Pennsylvania death
penalty statute. In pertinent part, that
section provided, "[t]he verdict must be a
sentence of death if the jury unanimously
finds at least one aggravating circumstance ... and no mitigating circumstance
or if the jury unanimously finds one or
more aggravating circumstances which outweigh any mitigating circumstances." Blystone argued that this provision violated
the eighth amendment's guarantee of individualized sentencing in that it mandated a
death sentence in certain circumstances
and, in so doing, impermissibly precluded
the jury from evaluating the weight to be
afforded that aggravating circumstance.
The California jury instruction at issue in
*Boyde* provided, in pertinent part, "If you
conclude that the aggravating circumstances outweigh the mitigating circumstances,
you shall impose a sentence of death."
The Supreme Court rejected the eighth
amendment challenges to both of these
statutes.

Like Petitioner, the challengers in each
of these cases argued that the effect of the
statutory language was to create a mandatory presumption in favor of the death
sentence which precluded the jury from
assessing the propriety of the death sentence in each case. In rejecting this argument, the Court stated:

[d]eath is not automatically imposed upon conviction for certain types of murder. It is imposed only after a determination that the aggravating circumstances outweigh the mitigating circumstances in the particular crime committed by the particular defendant, or that there are no such mitigating circumstances. This is sufficient under *Lockett* and *Penry* (footnote omitted).

*Blystone,* 495 U.S. at ——, 110 S.Ct. at 1082–83. As in Pennsylvania, a sentence of death is imposed in Illinois only after the sentencing authority determines that the aggravating circumstances outweigh the mitigating circumstances in the particular crime committed by the particular defendant. Accordingly, we reject Petitioner's eighth amendment challenge to this aspect of the Illinois death penalty statute.

■ Along with the preceding three challenges to the facial validity of the Illinois statute, Petitioner has raised two challenges which merit little discussion by this court. Initially, Petitioner argues that the Illinois death penalty statute is unconstitutional in that it fails to provide for "comparative proportionality review". Some state death penalty statutes, particularly those modeled after the scheme in place in Georgia, require a reviewing court to determine to some degree whether a sentence is disproportionate to that which has been imposed in other similar cases. *Pulley v. Harris,* 465 U.S. 37, 44, 104 S.Ct. 871, 876, 79 L.Ed.2d 29 (1984). While recognizing that many states provide for proportionality review in their statutes, the Court in *Pulley* concluded that such a review is not constitutionally mandated. *Id.* at 45, 104 S.Ct. at 876. Rather, it is simply an "additional safeguard against arbitrarily imposed death sentences...." *Id.* at 50, 104 S.Ct. at 879. In that we do not believe that the remainder of the Illinois statute is lacking in procedural safeguards so as to mandate the addition of proportionality review, we reject Petitioner's argument that proportionality review is constitutionally required.

■ As a final challenge to the facial validity of the Illinois statute, Petitioner argues that it violates the eighth and fourteenth amendments in that it fails to provide a means of assuring that all aggravating circumstances relied upon by the sentencer are relevant or constitutionally permissible. In support of this argument, Petitioner raises the Supreme Court's decision in *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). Petitioner's challenge, however, misapplies the holding of the Court in *Zant.* In upholding the petitioner's sentence in *Zant,* the Court distinguished between the roles which "statutory" and "nonstatutory" aggravating circumstances play under the Georgia sentencing scheme. The Court stated:

statutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty. But the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death.

*Id.* at 878, 103 S.Ct. at 2743 (footnote omitted). Petitioner's challenge appears to focus on this latter class of aggravating circumstances—i.e., those "nonstatutory" aggravating circumstances which assist the sentencing authority in making an individualized decision at the "selection stage" of the sentencing hearing. With respect to these factors, the Illinois statute expressly states in § 9–1(c):

[t]he court shall consider, or shall instruct the jury to consider any aggravating and any mitigating factors *which are relevant to the imposition of the death penalty.* Aggravating factors may include but need not be limited to [the statutory aggravating factors] set forth in subsection (b) (emphasis added).

Thus, contrary to Petitioner's assertions, the jury's discretion at the selection stage of the sentencing hearing is focused on that which is "relevant" to the task at hand. As the Court has stated:

[w]e expect that sentencers will exercise their discretion in their own way and to the best of their ability. As long as that

discretion is guided in a constitutionally adequate way (citation omitted), and as long as the decision is not so wholly arbitrary as to offend the Constitution, the eighth amendment cannot and should not demand more.

*Barclay v. Florida,* 463 U.S. 939, 951–52, 103 S.Ct. 3418, 3425, 77 L.Ed.2d 1134 (1983). In light of this precedent and the extent to which the jury's discretion is guided under the Illinois statute, we reject as meritless Silagy's assertions to the contrary.

### B. AS APPLIED ATTACKS ON ILLINOIS STATUTE

Petitioner's arguments thus far have focused on the facial validity of the Illinois death penalty statute under the sixth, eighth, and fourteenth amendments. He also challenges the constitutionality of the statute as it has been applied in his case.

#### 1. Admission into Testimony of "False Facts"

The first of Silagy's arguments in this regard focuses on the admission at trial of what Petitioner refers to as "false facts" regarding his tour of duty in Vietnam. Under the guise of a fourteenth amendment due process claim and an eighth amendment cruel and unusual punishment claim, Petitioner argues that the reliability of his sentence was undermined by the jury's exposure to certain testimony regarding his activities in Vietnam which later turned out to be false. Before proceeding to address the merits of this claim, it is necessary to lay a factual foundation as to exactly what this information consisted of and, more importantly, how it came to be that this information was put before the jury.

As a result of Petitioner's stated intent to present the insanity defense at trial, three separate psychiatrists conducted psychiatric examinations of Petitioner and presented written reports to the court as to their findings. Two of these psychiatrists,

Drs. Pugh and Traugott, concluded in their reports and testified at trial that Petitioner was not insane at the time of his offense. Dr. Ziporyn, the third psychiatrist, came to an opposite conclusion and testified at trial as to that finding. These findings, however, are not the focus of Petitioner's due process argument. Rather, Petitioner focuses on the lies which he told Drs. Pugh and Traugott in his examinations and the extent to which this false information was presented to and, more importantly, relied upon by the jury in their decision to impose the sentence of death. The false information upon which Petitioner now premises this fourteenth amendment claim was presented to the jury in the following manner.

In his pretrial interviews with both Drs. Pugh and Traugott, Silagy conveyed materially false information regarding the nature of his service while in Vietnam. Dr. Pugh's written report to counsel and the court provides perhaps the most pronounced example of Petitioner's falsifications. Reviewing Petitioner's account of his Vietnam experience, Dr. Pugh wrote:

> He served a total of 19 months of combat duty in Vietnam. [ ...] In combat in Vietnam, he was exposed to a great deal of violence. He killed many of the enemy, both at a distance and close up. He says that on several occasions he killed people with knives, sometimes by cutting their heads off. He says he was captured by the enemy three times and was subjected to torture. He says that he was also subjected to interrogation by our side when he escaped from captivity because our intelligence was concerned that he might have given information to the enemy. He says that he also participated in torturing the enemy for the purpose of extracting information from their captives. He says that he participated in the MyLai massacre [sic] and talked with Lieutenant Calley shortly before that operation.[10]

---

**10.** Dr. Ziporyn's written report does not make reference to any account of Vietnam as relayed by Petitioner. Dr. Traugott's written report

makes only the following references to Vietnam:

> He then proceeded to explain that he had killed many people while in the armed forces

Neither Dr. Pugh's report nor that of Dr. Traugott, however, were admitted into evidence. Rather, at trial, these psychiatrists simply testified as to their conclusions concerning Silagy's sanity. In that Petitioner's challenge to this information is necessarily limited to the extent to which it was presented to the jury, we will focus our attention on that issue.

During the guilt/innocence phase of the trial, each doctor was called to the stand to testify. As a witness for the defense, Dr. Ziporyn made no reference to Petitioner's accounts of his experiences in Vietnam. The testimony of Drs. Pugh and Traugott, however, did briefly touch on the subject. As a witness for the prosecution, Dr. Traugott's testimony regarding Petitioner's accounts of his Vietnam experience was very limited.[11] The extent to which Petitioner's fabrications were presented to the jury on defense counsel's cross-examination, however, was not so limited. Defense counsel specifically asked Dr. Traugott how Petitioner's alleged military experience had entered into his diagnosis. Dr. Traugott responded:

> In several ways. There's a history of alcohol abuse while he's in the service. There's a history of drug abuse.... [ ] another reference made to possible reactive psychosis in the Service. [ ...] I think in looking at this man's actions, how he was able to kill two women, that he was trained in the service of our country to kill people, and would have a reaction, some pattern of being around people who were killed.

With regard to the trial testimony of Dr. Pugh, all references to Petitioner's alleged acts of violence in Vietnam were the result of defense counsel's cross examination. Indeed, only over the objection of the prosecutor did the following discourse take place:

> in Vietnam.... He spoke openly about his alcoholism and also openly about his drug abuse while a soldier stationed in Vietnam.

11. He testified to the fact that Petitioner had talked with him "concerning some of his military experiences and some of his family history." Regarding an alleged history of psychosis

Q Now, turning specifically to talking about the unit in Viet Nam. He served 19 months in combat?

A Yes.

MR. FAHEY: I would object at this time.

THE COURT: Overruled. Answer may stand. Proceed.

Q Now, on your discussion with him of that tour of duty in Viet Nam, was there anything significant that you interpreted from that other than the situation telling us about transferring from the unit? Is there anything significant that you saw in that?

A Yes. I felt that his exposure to violence in Viet Nam, as I reported it, was unusually protracted and severe. Most people did not serve more than a year in Viet Nam. And he told me he was captured three times and was tortured in the course of interrogation by the enemy, and that he participated in torturing the enemy who was captured. One time interrogated by intelligence on our side because they were afraid he had told the enemy things under torture. He had killed a number of enemy, sometimes at a distance, sometimes up close. He had killed them with knives; killed some by cutting their heads off. And ...

(Intervening testimony is lost)

Q ... sounded like he had an awful lot of exposure to violence that most people don't have. And you thought that this was a significant factor in this psychological makeup?

A Yes, I did. Somebody who has been exposed to violence of that sort may become quite callous to it, whereas it might never occur to someone who never has seen a murder or been threatened with murder. It is certainly something that would occur to somebody who had been repeatedly exposed to it, if they are under duress.

in the military, Dr. Traugott stated, "The only thing I know about that is there is a verbal report of Mr. Silagy that another psychiatrist said there may have been a reactive psychosis. It is unverified by any other documents or records. That's his report alone on this, a psychiatrist's interpretation."

This constituted the testimony regarding Vietnam presented at trial.

In closing argument, the prosecution's reference to Vietnam was limited. The prosecution stated, "Vietnam, we don't know that much, but we know he had amnesia." Again, however, defense counsel went to great lengths to discuss the subject. Defense counsel argued:

> You've heard about Mr. Silagy's tour of duty in Vietnam at the age of eighteen. You've heard of violence associated with that—the combat duties, that he had and the experiences and length of that tour of duty. I believe it was Dr. Pugh who testified yesterday about that great exposure to violence, about 19 months that he served in combat. That he related killing people from close up, from far away....
>
> Both of the individuals, both doctors Traugott and Pugh testified about the periods of what they termed as reactive psychosis, reactive psychosis which took place first in Vietnam and, second, in prison....
>
> both Dr. Pugh and Dr. Traugott talked abot [sic] his Viet Nam experience. And I think Dr. Pugh said how protracted and severe the violence that Charles Silagy was exposed to was. And Dr. Pugh also testified as to how that conditioning gave him apparently a nonchalance, a lesser reluctance towards violence, how this conditioning through Viet Nam had added to his mental state.

Thus, to the extent Petitioner's own fabricated account of his experiences was referred to during the course of the guilt/innocence phase of the trial, it was primarily the result of defense counsel's own doing.

At the request of the prosecution, all of the evidence which had previously been admitted into the guilt/innocence phase was admitted into the sentencing hearing. At no point during the course of the sentencing hearing, however, was express ref-erence made to any aspect of Petitioner's alleged experiences in Vietnam. Rather, the prosecution simply argued:

> Mr. Silagy has proved throughout his lifetime ... that he is a violent man; that he has proved through his convictions and through the testimony that he continues to be a violent man....
>
> The facts ... only indicate, one, that Mr. Silagy is an incredibly violent man; and, two, that he has a very, very bad temper. That's all the evidence shows. That is the evidence by Dr. Traugott and Dr. Pugh, who, both—one didn't diagnose anything but alcoholism Mr. Silagy has a problem with. The other one—neither within that realm diagnosed him as having a mental disease or defect.

Beyond this, the nature of the argument during the closing portions of the sentencing hearing consisted only of Petitioner, who at this point was proceeding *pro se,* asking the jury to allay any feelings of sympathy they may have and sentence him to death.

Only years after allowing all of this testimony to come in at trial as an accurate reflection of his experiences in Vietnam did Petitioner reveal that his stories about Vietnam were not in fact true. Indeed, Petitioner did not disclose the actual nature of his tour of duty in Vietnam until all of his state remedies had been exhausted and he had petitioned the district court for habeas corpus review.[12] Yet, it is precisely upon the jury's exposure to his own false statements that Petitioner bases his fourteenth amendment claim. Although it is apparent that false information was presented to the jury whose decision it was to impose the sentence of death, under the unique circumstances of this case we cannot conclude that Petitioner has suffered a violation of his due process rights.

This is an issue the State thought to be waived. We do not agree and will address

---

**12.** During the course of an evidentiary hearing before the district court, Petitioner testified that he was not present at the MyLai Massacre and that he did not know Lt. Calley. In addition, Petitioner stated that he had never engaged the enemy in hand-to-hand combat, had not tor-tured the enemy, and did not cut off their heads. In actuality, Petitioner testified that he was a track vehicle repairman, a construction and utilities worker and a mail clerk while stationed in Vietnam.

the merits. On the merits, however, Petitioner's due process claim must fail. Petitioner premises this claim on the holding of the Supreme Court in *Townsend v. Burke,* 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948). In *Townsend,* the Court was asked to reverse the sentence of a prisoner who, without the benefit of counsel, had been sentenced on the basis of assumptions concerning his criminal record which were materially untrue. *Id.* at 741, 68 S.Ct. at 1255. In concluding that due process required that the sentence be reversed, the Court stated, "it is careless or designed pronouncement of sentence on a foundation so extensively and materially false, *which the prisoner had no opportunity to correct by the services which counsel would provide,* that renders the proceedings lacking in due process." *Id.* (emphasis added). As is evident from this language, the Court's due process concern focused on situations in which the prisoner did not have an adequate opportunity to respond to the false nature of the information presented to the jury. This same concern prompted this court to vacate the death sentence imposed on the petitioner in *Lewis v. Lane,* 832 F.2d 1446 (7th Cir.1987), *cert. denied,* 488 U.S. 829, 109 S.Ct. 83, 102 L.Ed.2d 59 (1988). In *Lewis,* the prosecution erroneously represented to defense counsel, and to the jury during the sentencing hearing, that the petitioner had previously been convicted of four prior felony convictions. Certified records which were later obtained by the prosecution, yet concealed from defense counsel, revealed that petitioner had actually been convicted of only two prior felony convictions. Based on the inaccurate nature of this information and the inability of the petitioner to adequately respond to same, this court determined in the context of a sixth amendment "effective assistance of counsel" claim that the sentence imposed must be reversed. *Id.* at 1458.

 The due process concerns which underlied the Supreme Court's decision in *Townsend* and, indirectly, this court's decision in *Lewis* are not present under the facts presented to the court today. Specifically, we reject Petitioner's assertion that his due process rights were implicated by the introduction of the Vietnam testimony into his sentencing hearing. The exposure about which Petitioner now complains was nothing but the result of his own fabrications of his Vietnam experiences. Indeed, to the extent the information which came into evidence at trial had explicit references to Silagy's fabricated acts of atrocity, it was the result of his own counsel's cross examination of the State's psychiatrists. Any references to Vietnam during the State's direct examination of these witnesses was very limited and nondescript. Finally, in response to the State's motion to admit into the sentencing hearing all of the evidence presented at trial, the Petitioner was expressly asked whether he understood the implications of such an admission. In particular, Petitioner was asked whether he understood that the admission of this testimony would necessarily include the testimony of the psychiatrists. Petitioner responded that he did understand.

In sum, it was Petitioner's own efforts to disguise the facts which led to false information being elicited by his own counsel. Moreover, Petitioner had an adequate opportunity to respond to the inaccurate nature of the information and, more importantly, prevent it from being presented to the jury during the sentencing phase of the trial. Based on all of these facts, there was no deprivation of due process.

 Petitioner's eighth amendment challenge to the admission of this testimony during the sentencing hearing presents a different issue for this court's consideration—i.e., whether the admission of this testimony undermined the reliability of the sentence of death such that a remand for resentencing is necessary. As the Supreme Court has admonished, "[t]he fundamental respect for humanity underlying the eighth amendment's prohibition against cruel and unusual punishment gives rise to a special 'need for reliability in the determination that death is the appropriate punishment' in any capital case." *Johnson v. Mississippi,* 486 U.S. 578, 584, 108 S.Ct. 1981, 1986, 100 L.Ed.2d 575 (1988) (quoting *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 2991–92, 49 L.Ed.2d 944

(1976) (White, J., concurring)). In *Johnson*, the Court was presented with an issue substantially similar to that which we must address today. Although the Court determined that a remand for resentencing was necessary to preserve the integrity of the eighth amendment's guarantees under the facts presented for its review, the principles underlying the Court's decision, combined with the nature of Petitioner's presentation during the sentencing hearing, convince us that such a remand is not necessary in this case.

The facts presented to the Court in *Johnson* were as follows. After being convicted of the murder of a police officer, the petitioner was sentenced to death by a jury based on its determination that the aggravating circumstances surrounding the petitioner and his crime outweighed any mitigating circumstances. One of the aggravating circumstances which the jury found to exist, and upon which the prosecution relied extensively in its arguments in favor of the imposition of the death penalty during the sentencing hearing, was a prior felony conviction from the State of New York. Subsequent to the petitioner's sentencing hearing and the jury's imposition of the death sentence based on this and other aggravating circumstances, this prior felony conviction was reversed by the New York Court of Appeals. In light of these facts, the Supreme Court concluded that the petitioner's sentence could not stand.

We are not confronted by a factual scenario that presents the type of "unreliability in sentencing" that prompted the Court to vacate the sentence in *Johnson*. Proceeding *pro se* in his sentencing hearing, Petitioner waived his right to present mitigating evidence and expressly asked the jury to impose the death sentence. He stated:

I do want the death penalty; and I will go to any lengths to have it served upon me. I took two lives through my own foolishness, not nobody else's fault. Mine. I paid twice before. I am willing to pay the price now, and no hesitation. . . .

You are dealing with the death penalty. That's what I want and would very much appreciate it if everyone of you could bring that verdict back. Thank you.

Moreover, although all of the evidence presented at trial was admitted into the sentencing phase of the proceedings, Petitioner's "Vietnam atrocities" were not expressly raised by the prosecution as an aggravating circumstance upon which the jury could rest its decision to impose the sentence. Based on this unique factual circumstance, we reject Petitioner's assertion that the jury's decision to impose the sentence of death must be vacated under the eighth amendment.

■ As a final thought, Petitioner argues, although without explication, that the psychiatric testimony of Drs. Pugh and Traugott was obtained in violation of *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). With regard to this claim, it is undisputed that Petitioner was not advised prior to the psychiatric examinations that his statements to the psychiatrists could later be used against him during the course of the trial. Nor is it disputed, however, that Petitioner's mental status had been put in issue at the time of these psychiatric examinations as a result of his assertion of the insanity defense. To the extent Petitioner's argument in this regard challenges the use of this testimony during the guilt/innocence phase of his trial under the fifth amendment right recognized in *Smith*, we reject his claim as meritless under the Court's subsequent decision in *Buchanan v. Kentucky*, 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987). In *Buchanan*, the Court held that the State's use of information obtained during a psychiatric examination for the limited purpose of rebutting a defendant's insanity defense does not implicate the fifth amendment. *Id.* at 423–24, 107 S.Ct. at 2918. To the extent this psychiatric testimony was admitted into the sentencing phase of the trial, Petitioner has expressly waived any objection to that admission. In response to the State's motion to introduce all of the trial evidence into the sentencing hearing, Petitioner was asked by the court whether he realized that the introduction of the trial

testimony would necessarily include the psychiatric testimony. Petitioner stated that he did understand and raised no objection. Accordingly, we find no fifth amendment violation to result from the introduction of this testimony.[13]

### 2. Propriety of Jury Instructions Re Mitigation

██ The focus of Petitioner's next argument is the following instruction which was given to the jury during the aggravation/mitigation phase of the sentencing hearing:

> Mitigating factors may include that: One, the murder was committed while the Defendant was under the influence of extreme mental or emotional disturbance although not such as to constitute a defense to prosecution; Two, any other facts or circumstances that provide reasons for imposing less than the most severe sentence.

Petitioner argues that the effect of this instruction, together with the prosecution's closing statements on this subject, was to unconstitutionally foreclose the jury's consideration of a mental state short of "extreme mental or emotional disturbance" which might have served as a mitigating factor counseling against the imposition of the death penalty. As with an earlier issue raised by Petitioner, our resolution of this issue is guided by the Supreme Court's recent decisions in *Blystone v. Pennsylvania*, 495 U.S. ——, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990) and *Boyde v. California*, 495 U.S. ——, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).

As a portion of his challenge to the constitutionality of his sentence under the Pennsylvania death penalty statute, the petitioner in *Blystone* argued that the court's instructions to the jury under § 9711(e) of the statute "impermissibly precluded the jury's consideration of lesser degrees of disturbance, impairment, or duress." 495 U.S. at ——, 110 S.Ct. at 1084. Section 9711(e) of the Pennsylvania statute provided for a list of mitigating factors, any combination of which the judge could instruct the jury to consider in deciding whether to impose the death sentence. In Blystone's case, the trial judge instructed the jury that they could consider "whether petitioner was affected by an 'extreme' mental or emotional disturbance, whether petitioner was 'substantially' impaired from appreciating his conduct, or whether petitioner acted under 'extreme' duress." As an additional catch-all instruction, the court instructed the jury that it was entitled to consider "any other mitigating matter concerning the character or record of the defendant, or the circumstances of his offense." *Id.* at ——, 110 S.Ct. at 1084. The Court determined that the instruction fully complied with the requirements of *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) and *Penry v. Lynaugh*, 492 U.S. ——, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), and rejected the argument on that ground. *Id.* Based on this precedent and the similarity of the instructions at issue before the court today, we conclude that Petitioner's argument is without merit.[14]

### 3. Petitioner's *Faretta* Right to Proceed Pro Se

Prior to the commencement of the sentencing hearing, Petitioner indicated that he wished to proceed *pro se* during the

---

**13.** In *Smith,* the Court also addressed the sixth amendment implications of the State's use of information obtained during a court-ordered psychiatric examination about which defense counsel had not been informed. Although Petitioner has not developed a *sixth amendment* claim under *Smith,* we note that, as in *Buchanan, supra,* Petitioner's counsel expressly requested the psychiatric examination for purposes of supporting his insanity defense. Under such circumstances, we find no sixth amendment violation. *Buchanan,* 483 U.S. at 424–25, 107 S.Ct. at 2918–19.

**14.** After the district court had denied Petitioner's writ as to his conviction, Petitioner filed a Rule 60(b) motion under the Federal Rules of Civil Procedure for relief from the district court's judgment based, in part, on the impact which the Supreme Court's decision in *Penry v. Lynaugh, supra,* had on this particular argument. Our rejection of Petitioner's argument in this regard necessarily includes a dismissal of this aspect of his Rule 60(b) motion.

sentencing phase of the trial. After extensively advising Petitioner of his rights and the possible implications of his choice to proceed on his own, the court ruled:

> the Defendant is a responsible person who is under no mental disability and who is knowingly, intelligently, and understandingly, electing to proceed in his defense as he has suggested. The court further finds that the Defendant understands the nature of the charges for which he's been convicted, the seriousness of the possible penalties in the case, and has freely and voluntarily undertaken to act as his own attorney....

Proceeding on his own during the sentencing phase of the trial, Petitioner chose to offer no evidence in mitigation and, in fact, asked the jury to return with a sentence of death. It is upon this factual foundation which Petitioner raises his next challenge to the constitutionality of his sentence. He argues that the imposition of the death penalty under these circumstances constitutes a violation of the eighth amendment's guarantee against cruel and unusual punishment. We disagree.

Petitioner's argument in support of this proposition is twofold. The first argument requires this court to reconcile his sixth amendment right to proceed *pro se* under *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), with the societal interest of ensuring that death is the appropriate sentence in each case in which it is imposed. *Ake v. Oklahoma*, 470 U.S. 68, 83–84, 105 S.Ct. 1087, 1096, 84 L.Ed.2d 53 (1985). Petitioner argues that in situations such as his where no evidence in mitigation is presented, the *Faretta* right to refuse the assistance of counsel must yield to the latter described interest of society. We believe that Petitioner mischaracterizes the scope of the sixth amendment right granted in *Faretta*.

In *Faretta*, the Court recognized the constitutional right of a criminal defendant to refuse state-provided counsel and proceed without representation if he voluntarily and intelligently elects to do so. Concluding that this right is implicit in the sixth amendment, the Court stated, "[t]he sixth

amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense." 422 U.S. at 819, 95 S.Ct. at 2533. Moreover, the Court stated, "[t]he language and spirit of the sixth amendment contemplate that counsel, like the other defense tools guaranteed by the amendment, shall be an aid to the willing defendant—not an organ of the State interposed between an unwilling defendant and his right to defend himself personally." *Id.* at 820, 95 S.Ct. at 2533. Petitioner, however, attempts to distinguish the right to proceed *pro se* which was recognized in *Faretta* on a number of grounds. We find each of his arguments lacking in merit.

■ Initially, Petitioner argues that the right recognized in *Faretta* is not applicable within the context of a sentencing hearing in a capital case. Petitioner premises this argument on the simple fact that *Faretta* did not involve a death-eligible defendant. Relying on this fact and the Court's recognition in subsequent cases—i.e., *Gregg v. Georgia* and its progeny—that there must be an individualized sentencing determination in each capital case, Petitioner argues that the *Faretta* right cannot apply in the capital sentencing phase of a trial. We disagree. The Court in *Faretta* did not impose any restrictions upon a defendant's right to refuse the assistance of counsel except to state that the right must be "knowingly and intelligently" waived. 422 U.S. at 835, 95 S.Ct. at 2541. Moreover, we can think of no principled reason to deny a death-eligible defendant his *Faretta* right to proceed without the assistance of counsel. If an individual in a capital sentencing hearing wishes to proceed *pro se, Faretta* grants him the right to do so.

■ Petitioner's next argument attempts to make the sixth amendment right granted in *Faretta* contingent upon the nature of the defense which the Petitioner wishes to present. Specifically, Petitioner argues that the sixth amendment right which *Faretta* recognized does not apply in situations, such as his, where no evidence is presented in mitigation during the sentencing phase. Although it is evident that

such a decision on the part of a death-eligible defendant may impact the jury's decision-making process, we do not believe that the right which *Faretta* grants can or should be contingent on this factor. As the Court stated in *Faretta:*

> [t]he right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of "that respect for the individual which is the lifeblood of the law."

*Id.* at 834, 95 S.Ct. at 2540–41 (quoting *Illinois v. Allen*, 397 U.S. 337, 350–51, 90 S.Ct. 1057, 1064, 25 L.Ed.2d 353 (1970) (Brennan, J., concurring)).

As additional support for our conclusion, we note that a contrary result would turn the Supreme Court's recent decision in *Blystone v. Pennsylvania, supra,* on its head. In *Blystone*, the petitioner chose not to present any mitigation evidence during the sentencing phase of his trial, even though he was advised to the contrary by his trial counsel and warned of the possible implications of such a decision by the trial judge. Nevertheless, the ultimate decision of the Court was to affirm the death sentence that was imposed. The implication of the Court's decision in *Blystone*, then, is that one can choose to forego the presentation of mitigation evidence even over the contrary advice of counsel and the warnings of the court. In light of this fact, it would be strange indeed for this court to conclude that a decision to forego the presentation of mitigation evidence could act as a bar to a defendant's otherwise constitutional right to proceed *pro se.* Accordingly, we reject Petitioner's assertion to the contrary.

■ Second, Petitioner argues that his decision not to present mitigating evidence during the sentencing phase of his trial so undermined the reliability of his sentence that it cannot stand under the guarantees of the eighth amendment. Again, we disagree. As in *Blystone, supra,* Petitioner's jury was expressly instructed by the court that it could consider "any other facts or circumstances that provide reasons for imposing less than the most severe sentence." Thus, under the Court's determination in *Blystone* that "[t]he requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence", 495 U.S. at —, 110 S.Ct. at 1083, 108 L.Ed.2d 255 Petitioner's argument in this regard must fail.

### 4. Jury Verdict Impeachment under Fed.R.Evid. 606(b)

■ During the sentencing phase of Silagy's trial, an individual juror took it upon himself to inform other members of the jury about his understanding of Illinois sentencing procedures. In an offer of proof before the district court, this juror testified that he told the others that it was his belief that Silagy would serve no more than five to seven years if they sentenced him to life. He also testified to opining to the other jurors that, even were they to sentence Petitioner to death, he would never be executed, but would spend more than seven years in prison. The district court sustained the State's objection to this testimony under Federal Rule of Evidence 606(b).[15] Petitioner points to these representations and argues under various constitutional amendments that the jury's sentencing decision cannot stand and that the district court's exclusion of this proffered evidence was error. We disagree.

As the district court concluded, this discussion was simply the result of "a juror's erroneous ideas"—that is to say, this is not

---

**15.** The district court also referred to *People v. Silagy,* 116 Ill.2d 357, 369, 107 Ill.Dec. 677, 681, 507 N.E.2d 830, 834 (1987), in which the Illinois Supreme Court held that the dismissal of this claim without an evidentiary hearing before the Illinois trial court in a post-conviction proceed-

ing was proper. *See People v. Holmes,* 69 Ill.2d 507, 511, 14 Ill.Dec. 460, 462, 372 N.E.2d 656, 658 (1978) (affidavits or testimony to show "the motive, method or process by which the jury reached its verdict" is not admissible).

something upon which we permit the impeachment of jury verdicts under Federal Rule of Evidence 606(b). As was noted by this court in *United States v. Ford*, 840 F.2d 460 (7th Cir.1988), Rule 606(b) is designed to protect the judicial process from constant attempts to undermine jury verdicts through the scrutiny of the juror's thoughts and deliberations. With this policy in mind, this court "will not inquire into the jury's deliberative process, including arguments, *statements*, *discussions*, mental and emotional reactions, and votes, in the absence of a claim of external influence." *Id.* at 465 (emphasis added). Petitioner cannot use this juror's statements in a habeas corpus proceeding to impeach the jury's sentencing determination. *Shillcutt v. Gagnon*, 827 F.2d 1155, 1158–59 (7th Cir.1987) (Applying Rule 606(b) in a § 2254 hearing). Accordingly, Petitioner's challenge to his sentence based on that ground is rejected.

### 5. Mode of Execution

▮▮▮ Finally, we address that which is perhaps the most creative, yet least persuasive of Petitioner's arguments with regard to the constitutionality of his sentence. Petitioner argues that various of his constitutional rights were violated where the waiver of his rights to counsel and to present mitigation were not "intelligently" made because he was under the belief that he would be electrocuted rather than lethally injected. As is evident from Petitioner's statement to the authorities, this argument is what we might call the "kitchen sink." He stated:

> I want death, either by ... you can stand me up and shoot me, I don't give a fuck, you know. Her mom and dad can come over and stab me, I don't give a fuck, whatever they wanna do, you know. They can be their own judge and jury. As far as I'm concerned, I already know what I want. I want out, but I wanna die before my thirtieth birthday. I wanna die, early in the morning at six o'clock high, facing the east, on the fourteenth day of March, 1980, and I don't give a fuck how they do it. If they wanna hang me from that flagpole over there ... but

I don't wanna die in prison, I wanna die right here in Danville, and I don't care who the judge is. It don't make me no difference. Just give him a thrill so he can get his nut off, but I want the death penalty.

It is apparent that the method of execution did not play a role in Petitioner's decision to waive his right to counsel or his right to present mitigating evidence. Accordingly, we will not attempt to determine what, if any, constitutional rights might have been implicated by the state's decision to change the method of execution.

### C. CHALLENGES TO THE CONVICTION

In addition to challenging the constitutionality of his sentence in the habeas proceedings below, Petitioner raised a variety of challenges to the propriety of his conviction. In its final order, the district court rejected these challenges and denied Petitioner's writ. We will address these arguments in turn.

### 1. Fair–Cross–Section Challenge to Jury Venire

The primary attack which Petitioner raises as to the propriety of his conviction focuses on the process by which his jury venire was selected. Specifically, Petitioner argues that this process deprived him of his sixth amendment right to a jury selected from a fair-cross-section of the community as well as his fourteenth amendment right to due process. Although Illinois state law was not followed in the selection of Petitioner's jury venire, we do not believe that the impact of this irregularity was to deprive Petitioner of either his sixth or fourteenth amendment rights.

Contrary to Ill.Rev.Stat. ch. 78, ¶¶ 2 and 4 (1979), the official responsible for compiling the jury venire from which Petitioner's petit jury would ultimately be chosen exempted from jury service those persons who indicated on their jury questionnaires that they were seventy years of age or older. Although this Illinois statute expressly provides for the exemption of certain groups of individuals—i.e., persons un-

der the age of eighteen—there is no provision which exempts persons seventy years of age or older. Petitioner's sixth and fourteenth amendment arguments focus on this unwarranted exemption.

The primary issue presented under these facts is whether the exclusion of this group of individuals deprived Petitioner of his sixth amendment right to a jury selected from a fair-cross-section of the community. In *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the Supreme Court held that, in order to establish a prima facie violation of the fair-cross-section requirement, a defendant must show:

(1) that the group alleged to be excluded is a "distinctive group" in the community;

(2) that the representation of this group in the venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and,

(3) that the underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Id.* at 364, 99 S.Ct. at 668. The district court concluded that Petitioner had not met the first prong of the *Duren* test and, as such, had not raised a prima facie case of a sixth amendment violation. We agree.

Exactly what constitutes a "distinctive group" is a rather amorphous concept in that the Supreme Court has not burdened the term "distinctive group" with a precise definition. *Lockhart v. McCree,* 476 U.S. 162, 174, 106 S.Ct. 1758, 1765, 90 L.Ed.2d 137 (1986).[16] Age has not been a factor that has previously defined a group as a "distinctive group." The Court has, however, intimated that the concept of "distinctiveness" for sixth amendment purposes

must necessarily be linked to the purposes of the fair-cross-section requirement. As originally identified in *Taylor v. Louisiana,* those purposes are:

(1) to ensure that the commonsense judgment of the community will act as a hedge against the over-zealous or mistaken prosecutor;

(2) to preserve public confidence in the criminal justice system by ensuring that the community participates in the administration of our criminal laws; and

(3) to further the belief that sharing in the administration of justice is a phase of civic responsibility.

419 U.S. at 530–31, 95 S.Ct. at 698; *Lockhart,* 476 U.S. at 174–75, 106 S.Ct. at 1765–66.

 Relying on this precedent, Petitioner argues that the state official's act of singling out persons over the age of seventy created a distinctive group whose exclusion violated the fair-cross-section requirement of the sixth amendment. We disagree.

As an initial matter, we note that "age" has already been rejected by this circuit as a characteristic which can define a group for purposes of the fair-cross-section requirement. In *Davis v. Greer,* 675 F.2d 141, 146 (7th Cir.), *cert. denied,* 459 U.S. 975, 103 S.Ct. 310, 74 L.Ed.2d 289 (1982), this court held that persons between the ages of 18 and 21 do not constitute a "distinctive group" for purposes of the sixth amendment. This conclusion was premised in part on the Supreme Court's recognition in *Carter v. Jury Comm'n of Greene County,* 396 U.S. 320, 332, 90 S.Ct. 518, 525, 24 L.Ed.2d 549 (1970), that states remain free to confine the selection of venire-

---

**16.** Precisely what constitutes a "distinctive group" for purposes of the sixth amendment is not clear. The Court's decision in *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), holds that women constitute such a group. In his majority opinion for the Court in *Lockhart v. McCree,* Justice Rehnquist listed blacks and Mexican–Americans as groups who, along with women, have been the subject of prior "jury-representativeness cases." 476 U.S. at 175, 106 S.Ct. at 1766. Although the inclusion of these groups was premised on four-

teenth amendment equal protection claims, *Peters v. Kiff,* 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972) (plurality opinion) (blacks); *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) (Mexican–Americans), Justice Rehnquist proceeded in the course of his discussion to intimate that the exclusion of these groups might also constitute a violation of the fair-cross-section requirement. *Lockhart,* 476 U.S. at 175, 106 S.Ct. at 1766. Thus, these groups may also constitute *per se* "distinctive groups" for purposes of the sixth amendment.

persons to citizens meeting "specified qualifications of age and educational attainment...." [17] Although the exclusion before the court today is somewhat unique in that it was an individual state official, and not a statutory provision, that was responsible for the exclusion, this distinction is not one that is of constitutional significance. If the exclusion of a certain age group does not violate sixth amendment concerns when it is encompassed in a statutory provision, we decline to find a constitutional violation when the exclusion is simply the result of an individual state actor. [18]

We do not rest our conclusion solely on this precedent, however. That persons over the age of seventy do not constitute a "distinctive group" for purposes of the sixth amendment is further supported by an analysis of the purposes underlying the fair-cross-section requirement. First, we reject Petitioner's assertion that the exemption of persons over the age of seventy somehow threatens the extent to which the "commonsense judgment of the community" will be present in the impanelled jury. We do not question the generalized perception that older Americans do bring a unique perspective to jury proceedings. Petitioner, however, has failed to demonstrate that this perspective will not be adequately represented by those aged sixty and over who were represented on the venire wheel. Nor do we believe the exemption of elder American citizens from jury service substantially jeopardizes the public's perception of the fairness of the criminal justice system. Is such an exemption perceived as being any more unfair than the outright exclusion of persons between the ages of 18 and 21? Finally, while we recognize that the exclusion of this class of jurors implicated the concern of the sixth amendment that all persons continue to participate in the administration of justice, this unfortunate fact by itself cannot establish a fair-cross-section violation. The ultimate concern of the fair-cross-section requirement is to ensure that each criminal defendant be afforded his sixth amendment right to an "impartial jury." *Taylor v. Louisiana*, 419 U.S. at 530, 95 S.Ct. at 697–98. We do not believe that the exclusion of persons over the age of seventy jeopardized that right.

Finally, we reject Petitioner's assertion that the expert testimony of Dr. McConahay, a professor of public policy sciences at Duke University, established that persons over the age of seventy constitute a "distinctive group" for sixth amendment purposes. In this regard, we agree with the district court that while "the elderly have much to offer in terms of life experience and exposure", they cannot be classified as a "distinctive group" for sixth amendment purposes on the basis of age alone. [19]

---

**17.** The provisions of the Illinois jury selection statute, Ill.Rev.Stat. ch. 78, ¶ 2 (1979), provide for the exclusion from jury service of persons under the age of 18.

**18.** Petitioner points to this court's decision in *Davis v. Warden, Joliet Correctional Institute at Stateville*, 867 F.2d 1003, 1012 (7th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 285, 107 L.Ed.2d 264 (1989), in support of his assertion that to permit an individual actor to tinker with the provisions of a legislatively enacted statute necessarily undermines the principles behind the fair-cross-section requirement. In *Davis,* our concern was with the second prong of the *Duren* test and, specifically, with the extent to which the actions of the jury supervisor had redefined the term "community" as it appears in that context. Noting that the sixth amendment provides that a "defendant ... is entitled to a trial ... by an impartial jury of the state and district ..., *which shall have been previously ascertained by law*", this court held that such a redefinition of the term "community" should be undertaken by a legislature or court. *Id.* at 1010. The actions of the Chief Clerk in exempting persons over the age of seventy, although unwarranted under state law, do not raise the same constitutional concerns as did the actions of the jury supervisor in *Davis.* Specifically, no Illinois statute purports to define persons over the age of seventy as a "distinctive group." Moreover, we have held that the fact of age does not define one as a member of a "distinctive group". *See Davis v. Greer, supra.*

**19.** Petitioner's argument that the exclusion of these jurors also violated his fourteenth amendment due process rights is meritless. Petitioner argues that the Chief Clerk's actions in exempting persons who were not automatically exempt under the provisions of the Illinois jury selection law violated his rights to due process. Petitioner, however, cites no relevant authority in support of such an assertion. Accordingly, we reject this contention, as well as the remainder of Petitioner's Rule 60(b) motion which dealt

### 2. Competence of Trial Psychiatrists

As a second challenge to the constitutionality of his conviction,[20] Petitioner argues that he was denied his fourteenth amendment right to due process in that Drs. Pugh and Traugott were "incompetent" in their examinations and ultimate diagnoses regarding his sanity at the time of his offense. Petitioner premises this claim on the Supreme Court's decision in *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), and the affidavit of one Dr. Schwarz which states that the diagnoses and trial testimony of Drs. Pugh and Traugott were not professionally sound.[21] Petitioner raised this argument for the first time with the district court below. The district court rejected this argument concluding that the services performed by Drs. Pugh and Traugott were competent for purposes of federal due process. We agree with this ultimate conclusion and, accordingly, find no abuse of discretion in the district court's rejection of Dr. Schwarz's expert testimony. *Cf. United States v. De Soto*, 885 F.2d 354, 359 (7th Cir.1989).

In *Ake*, the Court stated, "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation and presentation of the defense." *Id.* 470 U.S. at 83, 105 S.Ct. at 1096. Petitioner argues that the diagnoses of Drs. Pugh and Traugott were incompetent in that they "accepted as reality" Petitioner's statements regarding his alleged experiences in Vietnam. The affidavit of Dr. Shwarz comes to this same conclusion.

Both Petitioner's argument and the supporting affidavit of Dr. Schwarz, however, fail to account for the testimonies of both Drs. Pugh and Traugott which expressly state that they did not "accept as reality" Petitioner's fabrications. Dr. Traugott testified at trial as follows:

Q Doctor, when you are conducting a psychiatric examination, Doctor, do you take what the people say at face value?

A No.

Q Then, would it be correct just because they say something, it is not necessarily a sign that it is true?

A That's correct.

Q In your examination of Mr. Silagy, did this general proposition hold true?

A Let me explain. In gathering data through an interview I sift and sort through it in my own mind, and this is something we are trained to do in our field, to look for consistency of statement. Do they hang together as a whole or are there conflicting parts in there. And to be able to make that kind of an evaluation, one has to be somewhat skeptical of everything that's said within the interview context and look at it in a very general sense.

Dr. Pugh testified to this same skepticism. Although Dr. Pugh's trial testimony does indicate that some reliance was placed on Petitioner's fabrications in arriving at his ultimate diagnosis, Dr. Pugh's written report simply states that those experiences "may have some bearing on the present charges." Moreover, Dr. Pugh's written report, which was before the district court, indicates that Petitioner's alleged experiences in Vietnam, to the extent they did enter into the equation, were only one

---

with the impact of *Penry v. Lynaugh* on this issue, without discussion.

**20.** Petitioner also challenges the propriety of his sentence with respect to this issue. Our resolution of this due process claim with regard to his conviction necessarily applies to the propriety of his sentence as well.

**21.** Petitioner sought the appointment of Dr. Schwarz under the Criminal Justice Act, 18

U.S.C. § 3006A (1979), in support of his claim that the court-appointed psychiatrists in the state trial were incompetent in their diagnoses. This appointment was denied by the district court. The affidavit of Dr. Schwarz supporting Petitioner's claim, however, was presented at the evidentiary hearing before the district court as an offer of proof.

factor among many which came together to support his diagnosis. This hardly establishes the unyielding reliance on false information which Petitioner and Dr. Schwarz wish to suggest. Thus, the factual premise underlying Petitioner's claim is unsupported on the very record from which he wishes to establish the psychiatrists' incompetence.

 Even were this not the case, we would be reluctant to open up this type of *Ake* claim to a battle of the experts in a "competence" review. Every aspect of a criminal case which involves the testimony of experts could conceivably be subject to such a review—a never ending process. In this case, as the district court noted, three experienced, board-certified, independent practicing psychiatrists were appointed to examine the Petitioner. Each psychiatrist conducted a thorough examination and submitted his diagnosis to the court. Two found him to be sane at the time of the murders. Dr. Pugh indicated that Petitioner suffered from alcoholism, alcoholic intoxication at the time of the incident, and a past history of acute reactive psychosis. Dr. Traugott concluded that Petitioner suffered from one of three mental disorders, all of which were similar in nature to an antisocial personality disorder. Each, however, concluded that Petitioner substantially understood the nature of his actions on the night of the killings and did have the ability to conform his conduct to the requirements of the law. Dr. Ziporyn, whose diagnosis is not challenged in this appeal, found Petitioner to be insane at the time of the offenses. Without regard to their ultimate diagnoses, we believe that this meets the requirements set forth in *Ake*.[22] A conclusion to the contrary would require this court and other federal courts to engage in a form of "psychiatric medical malpractice" review as part-and-parcel of its collateral review of state court judgments. The ultimate result would be a never-ending battle of psychiatrists appointed as experts for the sole purpose of discrediting a prior psychiatrist's diagnosis. We do not believe this was the intent of the Court in *Ake* when it held that indigent defendants who raise a defense of insanity are entitled to psychiatric assistance in the preparation of their defense. Accordingly, we reject Petitioner's fourteenth amendment due process claim concerning the competence of the psychiatrists at his trial.

## II.

For all of the foregoing reasons, we AFFIRM the district court's denial of the writ with respect to Petitioner's conviction and REVERSE the district court's grant of the writ vacating Petitioner's sentence of death.

## ON PETITION FOR REHEARING AND SUGGESTION FOR REHEARING EN BANC

Before BAUR, Chief Judge, and CUMMINGS, WOOD, Jr., CUDAHY, POSNER, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION and KANNE, Circuit Judges.

On consideration of the Petition for Rehearing and Suggestion for Rehearing *En Banc* filed in this case by Charles Silagy, a vote of the active members of the court was requested, and a majority of the active members of the court have voted to deny rehearing *en banc*. Judge Cudahy and Judge Ripple have submitted dissents from the denial of rehearing *en banc*.

All of the judges on the original panel have voted to deny the petition for rehearing. Accordingly, IT IS ORDERED that the aforesaid petition for rehearing be, and the same is hereby DENIED.

CUDAHY, Circuit Judge, dissenting from denial of rehearing en banc.

I respectfully dissent from the denial of rehearing en banc with particular concern for the issue of post-trial prosecutorial discretion and for the issues of arbitrariness

---

**22.** As was pointed out by the Court in *Ake,* the fact that due process requires that a competent psychiatrist be appointed does not mean that the indigent defendant has a constitutional right to select a psychiatrist of his personal liking or one who will testify in his favor. 470 U.S. at 83, 105 S.Ct. at 1096.

and lack of notice ably discussed in Chief Judge Baker's opinion below. *U.S. ex rel. Silagy v. Peters,* 713 F.Supp. 1246, 1258–60 (C.D.Ill.1989). The issues noted by Judge Ripple also merit plenary consideration.

RIPPLE, Circuit Judge, dissenting from denial of rehearing en banc.

The Illinois Supreme Court's description of the defendant's burden of producing mitigating evidence, *see People v. Bean,* —— Ill.2d ——, —— - ——, No. 65062, slip op. at 51–52 (April 18, 1990), *combined with* the statutory mandate that the evidence in mitigation must be sufficient to "preclude" death, is quite different semantically and, perhaps in substance, from the approach approved by the Supreme Court in *Blystone v. Pennsylvania,* 495 U.S. ——, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990).[1] An Illinois jury certainly is not given the same degree of direction as a Pennsylvania jury. Unlike a Pennsylvania jury, an Illinois jury apparently is not told, at least directly, that the aggravating circumstances must *outweigh* any mitigating circumstances. Therefore, it appears that an Illinois jury, faced with a situation where the aggravating and mitigating evidence is close or in equipoise, does not have the same guidance as a Pennsylvania jury. Indeed, even when the evidence in mitigation arguably outweighs that in aggravation, there is a substantial question as to whether the word "preclude" is sufficiently definite to give the juror meaningful guidance in arriving at a constitutionally permissible decision. While *Walton v. Arizona,* — U.S. ——, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) addresses the allocation of proof issue, it does not address squarely the linkage between that allocation and the vagueness problem presented by the Illinois statute. Nor does it address those combined problems in the context of a *jury* determination. *See generally Penry v. Lynaugh,* 492 U.S. ——, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

This is not an easy area and plenary reflection by the entire court might resolve the matter in favor of the constitutionality of the statute. However, we ought to resolve all doubts now both for the sake of this defendant and for the over one hundred defendants already awaiting execution under this statute. Those cases inevitably will come to this court. We should hear the matter en banc.

---

**1.** *See also Boyde v. California,* 495 U.S. ——, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).