Willie CLISBY, Petitioner–Appellee,
Cross–Appellant,

v.

Charlie JONES, Warden, Holman Unit,
Alabama Department of Corrections,
Respondent–Appellant, Cross–Appellee.

No. 89–7209.

United States Court of Appeals,
Eleventh Circuit.

May 4, 1992.

Cathy S. Wright, Maynard, Cooper, Fierson & Gale, P.C., Tony G. Miller, Deborah J. Long, Birmingham, Ala., for petitioner-appellee-cross-appellant.

Before TJOFLAT, Chief Judge, and FAY, KRAVITCH, HATCHETT, ANDERSON, EDMONDSON, COX, BIRCH and DUBINA, Circuit Judges.

TJOFLAT, Chief Judge:

Petitioner Willie Clisby, Jr., is incarcerated in an Alabama prison under a sentence of death for nighttime burglary of an occupied dwelling during the course of which one of the occupants is intentionally killed. *See* Ala.Code § 13–11–2(a)(4) (1975) (current version at Ala.Code Ann. § 13A–5–40(a)(4) (Michie 1982)). After an evidentiary hearing, the United States District Court for the Northern District of Alabama granted Clisby's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (1988) with respect to the death sentence because the state had denied petitioner "adequate psychiatric assistance during the sentencing phase of [his] trial" in violation of the Due Process Clause of the Fourteenth Amendment, as petitioner had alleged in two of his sixteen "grounds for relief."[1] The court further reserved judg-

Don Siegelman, Atty. Gen., John Gibbs and Sandra Stewart, Asst. Attys. Gen., Montgomery, Ala., for respondent-appellant-cross-appellee.

---

1. Petitioner's sixteen "grounds for relief" break down into twenty-five separate constitutional claims.

   1. Petitioner was deprived of his constitutional rights under the Sixth and Fourteenth Amendments because he was not adequately examined by a psychologist or psychiatrist.

   2. Petitioner was deprived of his constitutional rights under the Eighth and Fourteenth Amendments because he was not adequately examined by a psychologist or psychiatrist.

   3. Petitioner was deprived of his constitutional rights under the Fourteenth Amendment because he was not adequately examined by a psychologist or psychiatrist.

   4. Petitioner was deprived of his constitutional rights under the Sixth and Fourteenth Amendments because his trial counsel, left without the benefit of a psychiatric or psychological evaluation of petitioner, was forced to abandon the insanity defense.

   5. Petitioner was deprived of his constitutional rights under the Sixth and Fourteenth Amendments because his trial counsel, left without the benefit of a psychiatric or psychological evaluation of petitioner, was prevented from presenting meaningful mitigating evidence at the sentencing phase.

   6. Petitioner was deprived of his constitutional rights under the Sixth and Fourteenth Amendments because his trial counsel, having been denied the necessary funds, did not adequately present mitigating evidence at the sentencing phase.

   7. Petitioner was deprived of his constitutional rights under the Fifth and Fourteenth Amendments because he was convicted and sentenced on the basis of a confession obtained before he had been advised of his *Miranda* rights.

   8. Petitioner was deprived of his constitutional rights under the Sixth and Fourteenth Amendments because he was convicted and sentenced on the basis of a confession obtained before he had been advised of his *Miranda* rights.

ment on three claims of ineffective assistance of counsel[2] and two claims of incompetent psychiatric assistance in violation of the Sixth and Eighth Amendments, respectively.[3] Respondent Charlie Jones appealed from the portions of the district court's order granting habeas relief, and petitioner cross-appealed from the portions denying habeas relief. A panel of this court vacated the grant of habeas relief and remanded the case for further proceedings. *Clisby v. Jones*, 903 F.2d 1348 (11th Cir.1990). After withdrawing its original opinion, the panel issued a new opinion that reached the same result on different grounds. *Clisby v. Jones*, 907 F.2d 1047 (11th Cir.1990). We then agreed to rehear the case en banc, *Clisby v. Jones*, 920 F.2d 720 (11th Cir. 1990), and now reverse the district court's order granting habeas relief and affirm it on all other grounds. We further remand the case to the district court for a disposition of all remaining claims.

Part I of this opinion discusses petitioner's due process claim under *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Part II instructs the district court below, and all other district courts in this circuit, to resolve all constitutional claims raised in a petition for habeas

9. Petitioner was deprived of his constitutional rights under the First and Fourteenth Amendments because persons with conscientious and religious scruples about imposing the death penalty were excluded from his jury, thereby depriving him of a jury constituting a representative cross-section of the community.

10. Petitioner was deprived of his constitutional rights under the Sixth and Fourteenth Amendments because his jury did not constitute a representative cross-section of the community.

11. Petitioner was deprived of his constitutional rights under the Fifth and Fourteenth Amendments because he did not have adequate notice of the laws and procedural rules applicable to his case.

12. Petitioner was deprived of his constitutional rights under the Sixth and Fourteenth Amendments because he did not have adequate notice of the laws and procedural rules applicable to his case.

13. Petitioner was deprived of his constitutional rights under the Eighth and Fourteenth Amendments because electrocution as administered in Alabama is an unnecessarily cruel means of execution.

14. Petitioner was deprived of his constitutional rights under the Fourteenth Amendment because his sentence was not subject to adequate appellate review.

15. Petitioner was deprived of his rights under the Fifth and Fourteenth Amendments because, under the factual circumstances of his case, the death penalty is a disproportionately severe and excessive punishment and was applied in an arbitrary, capricious and freakish fashion.

16. Petitioner was deprived of his rights under the Fifth and Fourteenth Amendments because the Alabama death penalty has been discriminatorily applied against black defendants, impoverished defendants and male defendants, and petitioner's death penalty was imposed pursuant to this discriminatory pattern and practice.

17. Petitioner was deprived of his due process rights under the Fourteenth Amendment because the prosecutor made improper statements during closing argument.

18. Petitioner was deprived of his equal protection rights under the Fourteenth Amendment because the prosecutor made improper statements during closing argument.

19. Petitioner was deprived of his rights under the Fifth and Fourteenth Amendments because he was sentenced to death by the trial court in a resentencing hearing following a jury recommendation of death that did not rely on any psychiatric evidence concerning petitioner's mitigating mental condition.

20. Petitioner was deprived of his rights under the Fifth and Fourteenth Amendments because his confession was obtained improperly.

21. Petitioner was deprived of his rights under the Sixth and Fourteenth Amendments because his confession was obtained improperly.

22. Petitioner was deprived of his rights under the Fifth and Fourteenth Amendments because he did not have adequate notice of the statutory aggravating circumstances.

23. Petitioner was deprived of his rights under the Sixth and Fourteenth Amendments because he did not have adequate notice of the statutory aggravating circumstances.

24. Petitioner was deprived of his rights under the Fifth and Fourteenth Amendments because the jurors did not properly understand their role in the imposition of the death penalty.

25. Petitioner was deprived of his rights under the Eighth and Fourteenth Amendments because the jurors did not properly understand their role in the imposition of the death penalty.

**2.** *See supra* note 1 (claims 4 through 6).

**3.** *See supra* note 1 (claims 1 and 2).

corpus pursuant to 28 U.S.C. § 2254 (1988) before granting or denying relief.

## I.

■ Petitioner argues that he was denied due process of law by not receiving the assistance of a competent psychiatrist for sentencing purposes.[4] *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).[5] In *Ake*, the Supreme Court held that the Due Process Clause's

guarantee of fundamental fairness requires that a state, "at a minimum, assure the [indigent] defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in the evaluation, preparation, and presentation of the defense" whenever an indigent defendant "demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial." *Id.* at 83, 105 S.Ct. at 1096.[6] As applied to the penalty

---

4. Petitioner does not allege that the purported denial of competent psychiatric assistance affected the guilt phase of his trial.

5. In his petition, Clisby also raises a Sixth and an Eighth Amendment claim based on the alleged denial of competent psychiatric assistance. *See supra* note 1 (claims 1 and 2). As the district court reserved judgment on these claims, we do not address them here.

6. The Supreme Court denied Clisby's petition for a writ of certiorari on direct appeal from his conviction and sentence one day before releasing its opinion in *Ake.* Strictly applying the retroactivity test established in *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), and applied to capital cases in *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), the rule announced in *Ake* therefore would apply to petitioner's case only if it was acknowledged as required by the Federal Constitution one day before the Supreme Court elevated it to constitutional status. For several reasons, however, we decline to address the retroactivity of *Ake* to petitioner's case. First, we need not address the retroactivity question because, even assuming *Ake*'s retroactive application to petitioner's case, we find petitioner's claim without merit. *See, e.g., Skelton v. Whitley,* 950 F.2d 1037, 1043 (5th Cir.1992) (discussing district court's decision to forego *Teague* analysis). We recognize that, in *Penry,* the Supreme Court addressed the retroactivity question despite ruling against the petitioner on the merits. 492 U.S. at 328–32, 109 S.Ct. at 2952–53; *see also Hopkinson v. Shillinger,* 888 F.2d 1286 (10th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 3256, 111 L.Ed.2d 765 (1990). Our court, however, is bound by stricter constraints of judicial economy than is the Supreme Court. While our eyes remain narrowly focused on the resolution of the dispute at hand, the Supreme Court concerns itself also with the resolution of more general issues that reach beyond the specific case at hand. For example, had the Supreme Court in *Penry* merely sought to determine whether or not the writ should issue with respect to the petitioner's death sentence, it would not have had to determine the retroactivity of a rule it refused to adopt on the merits,

because it decided that the writ should issue on a separate ground. Second, should we address the retroactivity of *Ake* in this case, we would plunge ourselves down a Serbonian Bog. *See Landress v. Phoenix Mut. Life Ins. Co.,* 291 U.S. 491, 499, 54 S.Ct. 461, 463, 78 L.Ed. 934 (1934) (Cardozo, J., dissenting); *see also* John Milton, Paradise Lost bk. ii, 1. 592 ("A gulf profound as that *Serbonian bog*/Betwixt Damiata and Mount Casius old,/Where armies whole have sunk: the parching air/Burns frore, and cold performs th' effect of fire.") (emphasis supplied). For starters, we would have to decide whether or not the State waived the *Teague* retroactivity issue by failing to raise retroactivity in the district court, before *Teague,* and, after *Teague,* in its brief to the panel and at oral argument before the panel until instructed by the panel to address the question in a supplemental brief. In order to resolve the waiver question, we would first have to determine whether *Teague* retroactivity can be waived, a much contested issue. *Compare Moore v. Zant,* 885 F.2d 1497, 1524 (11th Cir. 1989) (en banc) (Johnson, J., dissenting) (*Teague* nonretroactivity is an affirmative defense and therefore waivable), *cert. denied,* —— U.S. ——, 110 S.Ct. 3255, 111 L.Ed.2d 765 (1990); *Ordway v. United States,* 908 F.2d 890, 896 (11th Cir.1990) (same), *cert. denied,* —— U.S. ——, 111 S.Ct. 2916, 115 L.Ed.2d 1080 (1991); *Williams v. Dixon,* 961 F.2d 448, 456 (4th Cir.1992) (same); *Hanrahan v. Greer,* 896 F.2d 241, 245 (7th Cir. 1990) (same); *Zant v. Moore,* 489 U.S. 836, 836–37, 109 S.Ct. 1518, 1519, 103 L.Ed.2d 922 (1989) (Blackmun, J., dissenting from denial of certiorari) (same); *Boardman v. Estelle,* 957 F.2d 1523, 1536 (9th Cir.1992) (courts of appeals have discretion to apply *Teague* despite state's waiver; holding that state waived *Teague*); *Kordenbrock v. Scroggy,* 919 F.2d 1091, 1104 n. 4 (6th Cir.1990) (holding that state waived *Teague,* thereby implying that *Teague* is waivable), *cert. denied,* —— U.S. ——, 111 S.Ct. 1608, 113 L.Ed.2d 669 (1991); *Hopkinson,* 888 F.2d at 1288 (holding that state did not waive *Teague,* thereby implying that *Teague* is waivable); Steven M. Goldstein, *Chipping Away at the Great Writ: Will Death Sentenced Federal Habeas Corpus Petitioners Be Able to Seek and Utilize Changes in the Law?,* 18 N.Y.U.Rev.L. & Soc.

phase of a capital case, *Ake* requires a state to provide the capital defendant with such access to a competent psychiatrist upon a preliminary showing to the trial court that the defendant's mental status is to be a significant factor at sentencing. *See Thompson v. Wainwright,* 787 F.2d 1447, 1459 (11th Cir.1986), *cert. denied sub nom. Thompson v. Dugger,* 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 825 (1987); *Smith v. McCormick,* 914 F.2d 1153, 1160 (9th Cir.1990); *see also Ake,* 470 U.S. at 84, 105 S.Ct. at 1097.[7]

■ Having been supplied with a psychiatric expert, petitioner does not allege a denial of psychiatric assistance, but a denial of competent psychiatric assistance. Although petitioner's claim thereby differs from *Ake* claims previously considered by this court, we see no reason substantially to diverge from our two-step analysis of

Change 357, 375 n. 102 (1990–91) *with Moore v. Zant,* 885 F.2d at 1519 n. 5 (Kravitch, J., dissenting) (*Teague* not waivable); *Hopkinson,* 888 F.2d at 1288 (addressing *Teague* despite state's assumed waiver "because the very scope of the writ of habeas corpus, and therefore our power to grant relief, is implicated"); *Coe v. Thurman,* 922 F.2d 528, 533 n. 1 (9th Cir.1991) (addressing *Teague* despite state's failure to raise it in appellate brief, because a finding of nonretroactivity "would have profound implications for the conduct of numerous cases in the Ninth Circuit"); *see also Collins v. Youngblood,* 497 U.S. 37, 110 S.Ct. 2715, 2718, 111 L.Ed.2d 30 (1990) ( *Teague* rule "not 'jurisdictional' in the sense that [a court] *must* raise and decide the issue *sua sponte*"). Finally, assuming no waiver, we would have to decide whether Clisby indeed seeks the benefit of a rule announced in *Ake* or asks us to extend *Ake* beyond its original compass. Should we find that he relies on a rule not yet announced, we would have to determine not whether *Ake* applies retroactively, but whether the rule petitioner seeks would apply retroactively should we decide to adopt it. Alternatively, should we find that petitioner merely requests the retroactive application of a rule announced in *Ake,* we would have to rule on the retroactivity of that rule. Although we have held that, in September 1978, "failure to request psychiatric assistance with respect to mitigating circumstances was not ineffective assistance of counsel [because] *Ake* was a change in the law not foreseeable" at that time, *Thompson v. Wainwright,* 787 F.2d 1447, 1459 n. 8 (11th Cir.1986), *cert. denied sub nom. Thompson v. Dugger,* 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 825 (1987), we also have declined to address the claim that *Ake* did not apply retroactively on the ground that "[p]rior to the decision in *Ake,* this court and its predecessor recognized an accused's constitutional right to psychiatric assistance under appropriate circumstances." *Magwood v. Smith,* 791 F.2d 1438, 1443 n. 9 (11th Cir.1986). We have not had occasion to pass on the *Teague* retroactivity of *Ake* to federal habeas petitions, not to mention the retroactivity of extensions of *Ake* not yet explicitly acknowledged as constitutionally required. Only one circuit so far has addressed either question. The Fourth Circuit, without discussion, summarily declared that "*Ake* an-

nounces a new rule which is not to be applied retroactively." *Bassette v. Thompson,* 915 F.2d 932, 938 (4th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1639, 113 L.Ed.2d 734 (1991). The Ninth Circuit, explicitly eschewing the question of *Ake's* retroactivity, *Harris v. Vasquez,* 949 F.2d 1497, 1519 (9th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 1275, 117 L.Ed.2d 501 (1992), held that a rule permitting or requiring collateral review of either the substance of "defendant-selected psychiatric assistance" or the competence of "defense psychiatrists" could not be retroactively applied under *Teague. Id.* at 1518, 1519. Since Clisby did not receive "defendant-selected psychiatric assistance," the *Harris* analysis does not apply in the present case. Moreover, Judge Noonan, in a thoughtful dissent, argued that *Ake* and the rule sought by the petitioner in that case, which he defined as "the right of an indigent defendant to the effective assistance of a psychiatrist in the evaluation, preparation and presentation of his case," *id.* at 1532 (Noonan, J., dissenting), fell within the fundamental fairness-accuracy exception to the *Teague* retroactivity rule, *Teague,* 489 U.S. at 300, 109 S.Ct. at 1096; *Saffle v. Parks,* 494 U.S. 484, 488, 110 S.Ct. 1257, 1260, 108 L.Ed.2d 415 (1990); *Sawyer v. Smith,* 497 U.S. 227, ——, 110 S.Ct. 2822, 2831, 111 L.Ed.2d 193 (1990). *Harris,* 949 F.2d at 1532–35.

7. Respondent urges us to adopt a narrow reading of *Ake* that would restrict a capital defendant's right to access to a competent psychiatrist for the evaluation, preparation, and presentation of mitigating evidence at sentencing to a case in which the state has introduced expert testimony regarding the defendant's future dangerousness. We reject such a categorical limitation of *Ake's* scope. We nevertheless emphasize that the state's introduction of expert testimony to establish aggravating factors at sentencing remains relevant to, even if not dispositive of, the trial judge's determination whether or not a refusal to allow the defendant access to competent psychiatric assistance for sentencing purposes would deny the defendant a fair trial. *See Bowden v. Kemp,* 767 F.2d 761 (11th Cir.1985); *Thompson v. Wainwright,* 787 F.2d 1447, 1459 (11th Cir.1986), *cert. denied sub nom. Thompson v. Dugger,* 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 825 (1987).

*Ake* claims.[8] We first examine the information before the trial court when it is alleged to have deprived the defendant of due process. *See, e.g., Thomas v. Jones,* 891 F.2d 1500, 1506 (11th Cir.1989), *cert. denied,* 495 U.S. 953, 110 S.Ct. 2220, 109 L.Ed.2d 545 (1990); *Messer v. Kemp,* 831 F.2d 946, 960 (11th Cir.1987) (en banc), *cert. denied sub nom. Messer v. Zant,* 485 U.S. 1029, 108 S.Ct. 1586, 99 L.Ed.2d 902 (1988); *Moore v. Kemp,* 809 F.2d 702, 710–13 (11th Cir.) (en banc), *cert. denied,* 481 U.S. 1054, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987). We then determine whether that information should have led the trial court to conclude that the defendant would probably not receive a fair trial. *See, e.g., Thomas,* 891 F.2d at 1506; *Messer,* 831 F.2d at 960; *Moore,* 809 F.2d at 710. "Specifically, we must assess the reasonableness of the trial [court]'s action at the time [it] took it," *Moore,* 809 F.2d at 710, and "we are to evaluate the actions of the trial [court] based on the evidence presented to [it]," *Thomas,* 891 F.2d at 1506.

We begin by reviewing the facts available to the trial court at the time when it is said to have denied petitioner a fair trial by refusing to grant petitioner access to a competent psychiatric expert. For purposes of this opinion, we will assume that petitioner made the preliminary showing required by *Ake* to be entitled to psychiatric assistance at sentencing. As petitioner complains of the trial court's failure to provide him with competent psychiatric assistance, rather than with psychiatric assistance of any form, we need concern ourselves only with the facts that could have

indicated to the trial court that the psychiatrists who examined petitioner provided incompetent assistance.

Petitioner was arrested on November 15, 1979. Pursuant to a court order, Dr. Robert Estock examined petitioner for competency to stand trial on December 7, 1979.[9] Counsel for petitioner at no time objected to the adequacy of Dr. Estock's competency examination. Following petitioner's arraignment on February 29, 1980, his counsel filed three motions requesting evaluation of petitioner's mental condition by a psychiatrist: a motion for psychiatric examination, a motion for court-appointed psychiatrist, and a motion for funds to hire a private psychiatrist. None of these motions specifically requested a psychiatric examination for possible mitigating circumstances. At a hearing on March 11, 1980, the trial court deemed the first motion granted as it already had ordered petitioner examined by Dr. Estock. It held the remaining two motions in abeyance pending the results of Dr. Estock's examination.[10]

No evidence regarding petitioner's mental condition was introduced during the guilt phase of petitioner's trial or during the sentencing hearing before the jury. The jury recommended the death sentence. Petitioner's counsel did not renew his two abeyant pre-trial motions until the sentencing hearing before the trial court on February 27, 1981. At this hearing, petitioner's counsel for the first time specifically requested that his client "be evaluated by a psychiatrist ... competent in the field to determine if Mr. Clisby suffers from such illness of delusions or derangement that

---

**8.** Respondent warns us that our consideration of petitioner's claim would engender a "never-ending battle of psychiatrists appointed as experts for the sole purpose of discrediting a prior psychiatrist's diagnosis," *Silagy v. Peters,* 905 F.2d 986, 1013 (7th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991), and, even worse, "would place courts in a psycho-legal quagmire," *Harris v. Vasquez,* 949 F.2d 1497, 1518 (9th Cir.1990). Although we are not unimpressed with the prospect of never-ending battles and psycho-legal quagmires, we do not share respondent's vision of infinite chaos. As our finite opinion in this case illustrates, our traditional *Ake* analysis is well suited for the task of determining whether or not a defendant has been deprived of a fair trial by

being denied the assistance of a competent psychiatrist.

**9.** At the pre-trial hearing on March 11, 1980, the trial court characterized Dr. Estock as "a private psychiatrist who comes in the jail" and "a psychiatrist, who is under contract with Jefferson County to make psychiatric evaluations of prisoners."

**10.** Apparently, the court was not aware of these results at that time. At any rate, the results of Dr. Estock's examination did not enter the record until the first sentencing hearing before the court.

would bring him within the mitigating circumstances as prescribed by the statute." In response, the trial court read into the record two letters from a social worker to the effect that Dr. Estock had examined petitioner and had found him competent to stand trial. The court denied both abeyant motions based on these accounts of the results of Dr. Estock's examination.

The trial court then entered findings and conclusions upholding the jury verdicts both as to guilt and as to sentence. After the Alabama Court of Criminal Appeals had affirmed the trial court, *Clisby v. State*, 456 So.2d 86 (Ala.Crim.App.1982), the Alabama Supreme Court remanded the case to the Court of Criminal Appeals, *Ex parte Clisby, Jr.*, 456 So.2d 95 (Ala.1983), which in turn remanded to the trial court for "reconsideration of its handling of Dr. Estock's report in view of the holdings of *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), and *Proffitt v. Wainwright*, 685 F.2d 1227 (11th Cir. 1982)," *Clisby v. State*, 456 So.2d 98, 99 (Ala.Crim.App.1983).

On remand, counsel for petitioner filed a motion for psychiatric examination "to be conducted in light of those mitigating factors or circumstances as set forth in Section 13A–11–13 (Alabama Code 1975)." The trial court granted the motion and, on April 25, 1983, petitioner was examined for approximately forty-five minutes by Dr. John Callahan, a board-certified psychiatrist affiliated with the University of Alabama Medical School. On April 26, 1983, petitioner's counsel called Dr. Callahan as a witness during the sentencing hearing before the trial court on remand. Dr. Callahan testified that petitioner had appeared on a list of persons to be examined for competency to stand trial, and that, as a consequence, Dr. Callahan had examined petitioner only for that purpose, and not for mitigating circumstances. In order to document the information available to the trial court, we quote those portions of Dr. Callahan's testimony on direct examination by petitioner's counsel that pertain to his qualifications and to the specifics of his examination of petitioner:

Q. Could you give us, please, sir, some of your educational background?

A. Yes, sir.

Q. As it relates to your medical training.

A. I received my medical training at the University of Rome, Italy. I graduated from there in 1960 and came to the United States. Did an internship at the [sic] New York State at Lawrence Hospital for one year, did a two year residency in anaesthesia at the Grasslands Hospital which is the West Chester Hospital. Went to Boston for one year of fellowship in anaesthesia for open heart surgery and practiced as anesthesiologist on Long Island at Mercy Hospital on [sic] Rockefeller Center in New York for approximately thirteen years. I decided to go into psychiatry and took a residency training program PGY two and three at Cherokee Mental Health Institute in Cherokee, Iowa and transferred for my third year of specialty training to the University of Alabama and graduated from that program in approximately October 1979. Since that time I'm also licensed in the State of Alabama.... I have been licensed in medicine since 1961 in New York State and Mississippi. After starting as attending assistant professor at the University of Alabama following my training one year later I took and passed the written boards for the American Board of Psychiatry and Neurology and one year later I passed and completed taking the oral portion in 1982 of June [sic]. I have been working for about three years at the Smolian Clinic in the out patient department, the crisis center and I worked about two one-half days a week at the County Jail doing interviews for competency.

....

Q. I notice on Defendant's Exhibit Number One, please, sir, there is a category there that says, reason for interview and item one is checked which states competency and then handwritten out beside that is the word stand trial, is that correct?

A. Yes, sir, that is my feeling that was what it was for.

Q. If that was the purpose of the interview what are you looking for in that regard during your interview?

. . . .

A. I would divide it roughly into two parts even three. Number one the persons [sic] ability to understand legal proceedure [sic]. His understanding of legal proceedure [sic]. The function of the jury, the function that the judge performs in the Courtroom. The various attorney [sic] in the Courtroom, his understanding of his charges. His understanding of the seriousness of his charges, possible penalties that he faces from the charges, just get a general idea of how much he knows about the legal system. I would then be interested in finding out if this person had any of the recognized mental illnesses.

Q. What do you mean if he had any recognized mental illnesses?

A. Well, whether I detect any types of psychosis, neurosis or character disorder or whatever. Whether he was perhaps organically impaired leading to dementia and diminished intellectual capacity or diminished memory.

. . . .

Q. Was that what you have outlined to us just now was that in fact, the nature of the interview that you had with Mr. Clisby?

A. Yes, sir, and to add the third item which I didn't. I would also be interested during the interview to see what his report [sic]—how he developed report [sic] with me and if he would be able to do that with his attorney in aiding in his own defense.

. . . .

Q. What test did you give Mr. Clisby during this interview, if anything?

. . . .

A. Number one I think I did a mental status examination which tests the patient's memory, intellectual functioning, perceptions, judgments, insights. I did some tests to determine his ability to do calculations. I did specific tests to determine his ability to register new items, to recall new items, to test his long and short term memory.

Q. Did you do any other tests?

A. In the line of general psychiatric examination I questioned him regarding various symptoms of the major mental illnesses [sic].

After petitioner had testified in his own behalf following Dr. Callahan's testimony, petitioner's counsel submitted to the court that, given the objective of Dr. Callahan's examination, the defense had been unable to obtain psychiatric assistance adequate to develop petitioner's purported mental infirmity as a possible mitigating circumstance. Significantly, petitioner's counsel never complained to the court about the adequacy of Dr. Callahan's examination in accomplishing its objective, namely to determine petitioner's competency, or about Dr. Callahan's general qualifications as a psychiatric expert. On the contrary, counsel for petitioner acknowledged that "[w]e had a *doctor* who testified here today . . . that [petitioner] is competent to stand trial." (Emphasis supplied.) Counsel for petitioner merely objected that "competency to stand trial is not the test and is not the criteria [sic] which is put in the statute concerning the proof or availability of proving mitigating circumstances." *See* Ala.Code § 13–11–7 (1975) (current version at Ala.Code Ann. § 13A–5–45 (Michie 1982)).

When the trial court inquired whether "[i]n view of Doctor Callahan's testimony . . . the defendant wish[ed] to be further examined," counsel for petitioner responded "Yes, sir, sure do." The trial court then ordered Dr. Callahan to reexamine petitioner the next day. Two weeks later, on May 10, 1983, Dr. Callahan again testified at yet another sentencing hearing before the trial court. According to Dr. Callahan's testimony, he had examined petitioner on April 27 for forty-five to sixty minutes regarding mitigating circumstances. We again quote from Dr. Callahan's testimony on direct examination regarding the specifics of this examination:

Q. What questions did you ask Mr. Clisby?

A. At the time of that examination I went into as much as the Defendant would allow the circumstances around which the events occurred which brought him to trial. His past psychiatric history. I discussed his family relationships and what influence they might have had on his present condition. I attempted to elicit any evidence of an emotional or mental disturbance which may have influenced his actions. I tried to determine what his capacity for understanding the nature of his act and conforming his behavior to the requirements of the law might be.

Q. And at the time, ... you were made aware that there was a previous homicide?

A. Yes, sir.

Q. As well as a homicide involved in the present case, is that correct?

A. Yes, sir.

Q. So, you were aware of two homicides?

A. Yes, sir.

Q. And you were aware some what [sic] of his family background, the fact that his mother is deceased as well as his father, is that correct?

A. Yes, sir.

Q. And he was raised by someone other than his parents from adolescent years on?

A. Yes, sir.

Q. With those facts in mind would that give you any indication that there may be some disorder with Mr. Clisby?

A. In speaking to the Defendant I was unable to determine any disorder other than possibly anti-social personality disorder.

Q. What do you mean anti-social personality disorder?

A. That he has had difficulty in the past in conforming his conduct to the rules of society. That he is not respectful of the rights of others, that he has a poor work history. That his ability or his—— [sic] to set long term goals is somewhat different.

Counsel for petitioner did not object either to the adequacy of Dr. Callahan's second examination or to Dr. Callahan's qualification to perform this examination. In particular, counsel did not suggest that Dr. Callahan's lack of familiarity with the Alabama death penalty statute on the date of the first hearing on remand [11] rendered Dr. Callahan incapable of performing an adequate examination of petitioner for mitigating circumstances the next day. As at the first hearing on remand, counsel for petitioner instead acknowledged that "a *Doctor* has come into Court and said that there is an existence of some mitigating circumstances." (Emphasis supplied.)

At the conclusion of the second hearing, the trial court again entered findings and conclusions upholding the jury's sentence recommendation. On appeal, the Alabama Court of Criminal Appeals remanded to the trial court for further consideration of psychiatric evidence in light of *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). *Clisby v. State*, 456 So.2d 99 (Ala.Crim.App.1983).

No evidence was presented at the sentencing hearing on second remand. During his argument to the court, petitioner's

---

**11.** At the first hearing on remand, the following interchange occurred between counsel for petitioner and Dr. Callahan:

Q. Have you ever had occasion to read or become aware of Alabama's capital homicide statute and the listing or verbage [sic] of the aggravating and mitigating circumstances contained therein?

A. No, I haven't.

Q. Are you familiar with the capital murder statute at all?

A. Only vaguely?

Q. And yet you have been dealing in the psychiatric field as it concerns criminal conduct or criminals for three or three and one-half years?

A. I have not been called in to testify in regard to the mitigating circumstances in a capital murder case. I didn't feel that today I was going to be called in to that. I was seeing the patient as was listed on the things for competency to stand trial and therefore I didn't review that law.

counsel not only did not suggest that Dr. Callahan had failed to provide petitioner with competent psychiatric assistance but also did not cite any facts that might have alerted the trial court to the inadequacy of Dr. Callahan's examinations. On August 3, 1983, five days after the hearing, the trial court issued written findings and conclusions upholding the jury's sentence recommendation. The Alabama Court of Criminal Appeals and the Alabama Supreme Court affirmed. *See Clisby v. State*, 456 So.2d 102 (Ala.Crim.App.1983); *Ex Parte Clisby*, 456 So.2d 105 (Ala.1984).

Petitioner's claim of a due process violation collapses as soon as one seeks to identify the trial court's ruling that purportedly rendered petitioner's trial fundamentally unfair.[12] Petitioner's counsel only once alerted the trial court to what might be construed as Dr. Callahan's failure to provide competent assistance. After the first hearing on the first remand, petitioner's counsel suggested to the trial court that he had been unable to obtain adequate psychiatric assistance for sentencing purposes because Dr. Callahan had examined petitioner only regarding competency to stand trial, and not regarding the existence of any mitigating circumstances. In response, the trial court ordered Dr. Callahan to examine petitioner with respect to mitigating circumstances. Petitioner's counsel never again complained of inadequate psychiatric assistance, even though he had plenty of opportunities to do so at the hearing immediately following Dr. Callahan's second examination on the first remand and at the hearing on the second, and final, remand. Even ignoring petitioner's failure to identify a due process violation in any particular ruling by the trial court, the trial court's immediate response to the first and only suggestion of inadequate psychiatric assistance, the absence of any further such complaints, and the information available to the trial court until the day it entered the final findings and conclusions compel the conclusion that petitioner was not denied a fair trial.

█ Unable to pinpoint the ruling in which the trial court denied him due process by violating his right to competent psychiatric assistance, petitioner is left with a naked complaint about the purported incompetence of Dr. Callahan's assistance. Stripped of its due process pretensions, petitioner's claim therefore amounts to an allegation of expert incompetence akin to an ineffectiveness of counsel claim under the Sixth Amendment. *Ake*, however, exclusively relied on due process grounds and explicitly refused to consider the applicability of the Sixth Amendment. *Ake*, 470 U.S. at 87 n. 13, 105 S.Ct. at 1098 n. 13. Although Clisby raises a Sixth Amendment claim of incompetent psychiatric assistance in his petition, he cannot raise it on appeal, and we cannot address it, because the district court has yet to rule on this claim. This observation carries our discussion over into part II, where we instruct the district court and all other district courts within this circuit to resolve all constitutional claims presented in a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (1988) before granting or denying relief.

## II.

Clisby's amended habeas petition originally presented a total of twenty-five claims of constitutional violations grouped

---

12. We do not address the question of whether or not due process, under certain limited circumstances, may require that the trial court intervene to ensure that a defendant receives the assistance of a competent psychiatrist. We need not address this question in this case, because the record is devoid of any indication that Dr. Callahan's final examination of petitioner was anything less than adequate. We further emphasize that the trial court's duty to intervene, should such a duty exist, would be limited to cases where the trial proceedings are so evidently and so fundamentally unfair as to threaten to render the trial a mockery of justice. We have held that *Ake* does not impose upon the trial court a duty *sua sponte* to appoint a psychiatrist. *Bowden v. Francis*, 733 F.2d 740, 749 (11th Cir.1984), *vacated and remanded*, 470 U.S. 1079, 105 S.Ct. 1834, 85 L.Ed.2d 135 (1985), *opinion on remand*, 767 F.2d 761 (11th Cir. 1985). Moreover, we have difficulty envisioning a case in which counsel's failure to alert the trial court to the manifest inadequacy of an expert's psychiatric assistance would not violate the defendant's right to effective assistance of counsel under the Sixth Amendment.

into sixteen "grounds for relief." After the evidentiary hearing, Clisby abandoned six claims, thereby leaving nineteen claims for the district court to consider.[13] The court dismissed thirteen claims, granted habeas relief on one (above referred to as claim three), and reserved judgment on the remaining five claims (above referred to as claims one, two, and four through six).[14] Claims one and two allege that petitioner was denied competent psychiatric assistance in violation of the Sixth and Fourteenth Amendments, and Eighth and Fourteenth Amendments, respectively. Claims four through six aver that petitioner was denied effective assistance of counsel in violation of the Sixth and Fourteenth Amendments.

■ Upon issuance of the district court's judgment, respondent filed a motion to alter or amend judgment, urging the court, inter alia, to address the ineffective assistance of counsel claims it had left unresolved. The motion did not mention the Sixth and Eighth Amendment claims relating to the alleged incompetence of Clisby's psychiatric assistance. The court's amended judgment issued in response to respondent's motion did not dispose of the ineffective assistance of counsel claims, or any other remaining claims.

At oral argument, respondent urged us to consider the ineffective assistance claims not addressed by the district court. This we clearly cannot do. We can do no more than remand the case to the district court to consider all remaining claims, including all claims alleging ineffective assistance of counsel and all claims alleging incompetent psychiatric assistance.

We nevertheless seize this opportunity to express our deep concern over the piecemeal litigation of federal habeas petitions filed by state prisoners, as exemplified by the district court's failure to resolve all claims in this case. The Supreme Court only recently has reemphasized the obligation of federal courts to consider the important interests of comity and finality implicated in federal habeas review of state convictions and sentences. *See e.g., Coleman v. Thompson,* — U.S. —, 111 S.Ct. 2546, 2552, 2554–55, 115 L.Ed.2d 640 (1991); *McCleskey v. Zant,* — U.S. —, 111 S.Ct. 1454, 1468–70, 113 L.Ed.2d 517 (1991); *Penry v. Lynaugh,* 492 U.S. 302, 313–315, 109 S.Ct. 2934, 2944, 106 L.Ed.2d 256 (1989); *Duckworth v. Eagan,* 492 U.S. 195, 208–10, 109 S.Ct. 2875, 2883, 106 L.Ed.2d 166 (1989) (O'Connor, J., concurring) (quoting *Harris v. Reed,* 489 U.S. 255, 280–82, 109 S.Ct. 1038, 1053, 103 L.Ed.2d 308 (1989) (Kennedy, J., dissenting)); *Teague v. Lane,* 489 U.S. 288, 304–11, 109 S.Ct. 1060, 1072–75, 103 L.Ed.2d 334 (1989) (plurality opinion); *see also In re Blodgett,* — U.S. —, 112 S.Ct. 674, 116 L.Ed.2d 669 (1992). Our court likewise has been sensitive to the disruptive effect federal habeas review has on a state's criminal justice system:

> Until [federal habeas] proceedings have been concluded, they cast doubt on a prisoner's conviction and interfere with the state's administration of its corrections program. Our procedures for handling habeas petitions are designed, in part, to minimize such disruption. For example, our rules discourage untimely and successive petitions, *see* Rule 9, Delayed or Successive Petitions, Rules Governing Section 2254 Cases, 28 fol. § 2254 (1982), and we emphasize the importance of litigating *all* of a petitioner's claims in one habeas proceeding, both at the trial and appellate levels.

*Blake v. Kemp,* 758 F.2d 523, 542 (11th Cir.) (Tjoflat, J., dissenting) (citations omitted), *cert. denied,* 474 U.S. 998, 106 S.Ct. 374, 88 L.Ed.2d 367 (1985).

■ We are disturbed by the growing number of cases in which we are forced to remand for consideration of issues the dis-

---

**13.** We distinguish between grounds and claims for relief for purposes of convenience only. This distinction should not be confused with the distinction between grounds and claims for purposes of finality pursuant to the final judgment rule embedded in 28 U.S.C. § 1291 (1988). *See,* e.g., *Blake v. Kemp,* 758 F.2d 523, 540–42 (11th Cir.) (Tjoflat, J., dissenting), *cert. denied,* 474 U.S. 998, 106 S.Ct. 374, 88 L.Ed.2d 367 (1985).

**14.** *See supra* note 1.

trict court chose not to resolve. *See, e.g., Alderman v. Zant,* No. 90–8981 (11th Cir. Dec. 27, 1991); *Mathis v. Zant,* 903 F.2d 1368 (11th Cir.1990); *Smith v. Zant,* 887 F.2d 1407 (11th Cir.1989) (en banc); *Lindsey v. Smith,* 820 F.2d 1137 (11th Cir.1987), *cert. denied,* 489 U.S. 1059, 109 S.Ct. 1327, 103 L.Ed.2d 595 (1989); *Wilson v. Kemp,* 777 F.2d 621 (11th Cir.1985), *cert. denied,* 476 U.S. 1153, 106 S.Ct. 2258, 90 L.Ed.2d 703 (1986); *Blake,* 758 F.2d at 523. Accordingly, we now exercise our supervisory power over the district courts, *see United States v. Jones,* 899 F.2d 1097, 1102 (11th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 275, 112 L.Ed.2d 230 (1990), and instruct the district courts to resolve all claims for relief raised in a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (1988), regardless whether habeas relief is granted or denied.

■ A claim for relief for purposes of this instruction is any allegation of a constitutional violation. Clisby's petition serves to illustrate this definition. Claims one and two amount to separate claims for relief because an allegation of one constitutional violation and an allegation of another constitutional violation constitute two distinct claims for relief, even if both allegations arise from the same alleged set of operative facts.[15] Policy considerations clearly favor the contemporaneous consideration of allegations of constitutional violations grounded in the same factual basis: "a one-proceeding treatment of a petitioner's case enables a more thorough review of his claims, thus enhancing the quality of the judicial product." *See Blake,* 758 F.2d at 543 (Tjoflat, J., dissenting); *see also Rose v. Lundy,* 455 U.S. 509, 520, 102 S.Ct. 1198, 1204, 71 L.Ed.2d 379 (1982) ("To the extent that the ['total exhaustion'] requirement reduces piecemeal litigation, both the courts and the prisoner should benefit, for as a result the district court will be more likely to review all of the prisoner's claims in a single proceeding, thus providing for a more focused and thorough review."); *Galtieri v. Wainwright,* 582 F.2d 348, 356 (5th Cir.1978) (en banc); *Smith,* 887 F.2d at 1422 (Tjoflat, J., specially concurring).

This benefit becomes particularly apparent in the case of a district court order granting habeas relief on claim A, while reserving judgment on claim B. Suppose the district court's grant of relief is reversed on appeal and, on remand, the court develops facts relating to claim B. Suppose further that the court, in the course of examining B's factual basis, becomes aware of facts relevant to its disposition of A, which it had not previously developed. The law of the case doctrine would now bar the court from granting relief on claim A, because its disposition of claim A had already been reversed on appeal. The possibility of such an unjust resolution looms especially large in a case like Clisby's, where the district court decides not to address all alleged constitutional infirmities arising from a single alleged set of operative facts. The fact findings necessary to dispose of one of several closely related claims very well might inform the disposition of another claim.

While a partial disposition of claims raised in a habeas petition, at first glance, may well appear to serve judicial economy, a closer look at the scenarios such a disposition might engender clearly establishes the opposite. The following discussion of these scenarios in the context of a 1989 case, *Smith v. Zant,* 887 F.2d 1407 (11th Cir.1989) (en banc), applies lock, stock, and barrel to the present case and thereby not only elucidates how the district court's piecemeal consideration of Clisby's petition threatens to undermine judicial economy, but also demonstrates that the district court's action in the present case represents anything but an isolated incident. The passage proceeds on the assumption that we affirm the district court's grant of the writ with respect to the sentence, while leaving petitioner's remaining challenges to his conviction unresolved.

[J]udicial economy might be served in the following situation: at the new sen-

---

**15.** As claims 3 and 4 illustrate, an allegation of a Fourteenth Amendment violation does not constitute a distinct constitutional claim only if this violation is alleged solely to establish a conduit for the application of another constitutional right to the states.

tencing trial conducted in state court, a life sentence might be imposed, and petitioner might decide to accept that sentence without returning to the district court to seek relief from his conviction by litigating the unadjudicated claims that challenge his conviction.[16] He might accept a life sentence, for instance, if he fears that a second trial to determine his guilt would again result in a conviction [of capital] murder, thereby subjecting him once more to a possible death sentence in the sentencing phase that would follow. In such a situation, petitioner might request the district court to dismiss his outstanding habeas claims, and the litigation would end.

Even if petitioner fears reconviction for the offense of [capital] murder, however, he might not accept the life sentence and thereby end the matter.... [Petitioner might] make an argument—sufficiently meritorious at least to require consideration by a court—that once a life sentence is imposed in the resentencing trial originally ordered by the district court, the state is thereafter precluded from seeking imposition of the death penalty after a new trial on the [capital] murder charge. See, for example, the debate between the majority and Justice Harlan, in *North Carolina v. Pearce*, on the issue of whether the double jeopardy clause of the [F]ifth [A]mendment protects a defendant, once sentenced, from later imposition of a harsher sentence following retrial. 395 U.S. 711, 749–50, 89 S.Ct. 2072, 2088, 23 L.Ed.2d 656 (1969) (Harlan, J., concurring in part and dissenting in part) ("[T]he defendant's choice to appeal an erroneous conviction is protected by the rule that he may not again be placed in jeopardy of suffering the greater punishment not imposed at the first trial."). If successful in such an argument, petitioner would then run no risk of a second death sentence even if reconvicted of [capital] murder and could litigate with impunity the remaining habeas claims challenging his conviction.

In other scenarios, a habeas petitioner has obvious incentive to litigate his remaining claims, thereby prolonging the litigation. If petitioner is optimistic about a more favorable outcome were the guilt phase of his trial to be repeated, for example, he will almost assuredly press the remaining habeas claims challenging his conviction. Even if he has received a life sentence at the new state court sentencing trial, that sentence would still be based on his original conviction [of capital murder]. Conviction of a lesser-included offense would mean a correspondingly lesser sentence. And if a petitioner is dissatisfied with his new sentence, e.g., he receives a death sentence once again, he can certainly be expected to press the remaining habeas claims challenging his conviction.

. . . .

[W]hether the court of appeals reverses or affirms a district court's grant of relief from a habeas petitioner's sentence based on less than all of petitioner's claims, federal judicial economy is undermined. In the event of reversal and remand to the district court, [as in the present case,] the district court will spend additional time and effort re-examining claims of sentencing [and, in the present case, also conviction] error that could have been disposed of in one proceeding. Even if the court of appeals affirms the grant of sentencing relief, as long as the petitioner remains without relief from his conviction, he will be back before the district court to litigate the undecided claims that challenge his conviction. Appeals will surely follow, taken either by petitioner or by the State....

When, as in [*Smith* and the present case], the district court orders the State to repeat the sentencing phase of the

---

**16.** Our decision in *Smith* affirming the grant of sentencing relief as a matter of law was entered as the judgment of the district court on December 29, 1989. On September 16, 1990, Smith was resentenced in state court to life imprisonment. At this time, no further action has been taken in the case. Specifically, Smith has not ended the habeas litigation by requesting the district court to dismiss the outstanding claims challenging his conviction.

petitioner's trial, the district court imposes an even greater disruption and expense upon the state system. The State must impanel a new jury for the purpose of sentencing petitioner. It must make room on a trial calendar for the second sentencing proceeding, which will result in delay for other litigants. The state court must reacquaint itself with petitioner's case. Then, after all that, if petitioner successfully attacks his conviction, the new sentencing proceeding still based on that conviction will have been for naught. The wasted time, expense, and imposition on jury members, state trial judges, and parajudicial personnel could have been avoided had the district court considered the claim and granted relief as to petitioner's conviction in the first place. Needlessly forcing the State to conduct a futile proceeding is entirely inconsistent with our policy of respect for, and minimal disruption of, the state courts.

*Smith,* 887 F.2d at 1420–1421 (Tjoflat, J., specially concurring).

The havoc a district court's failure to address all claims in a habeas petition may wreak in the federal and state court systems compels us to require all district courts to address all such claims. Accordingly, this court, from now on, will vacate the district court's judgment without prejudice and remand the case for consideration of all remaining claims whenever the district court has not resolved all such claims. The procedure we announce today is to be followed for all petitions for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (1988) decided in the district court after the expiration of one hundred and twenty days following the date of this opinion.[17]

### III.

For the reasons set forth in part I above, we REVERSE the judgment of the district court and REMAND the case for further proceedings.

IT IS SO ORDERED.

EDMONDSON, Circuit Judge, specially concurring:

I concur in the judgment. For background on my views, see *Clisby v. Jones,* 907 F.2d 1047 (11th Cir.1990), and *United States v. Jones,* 899 F.2d 1097, 1103 (11th Cir.1990). (Edmondson, J., concurring).

COX, Circuit Judge, specially concurring:

I concur in the judgment and join Part II of Chief Judge Tjoflat's opinion. I adhere to the view that the panel opinion correctly resolved the issues addressed in Part I of the opinion. *See Clisby v. Jones,* 907 F.2d 1047 (11th Cir.1990).

BIRCH, Circuit Judge, concurring specially:

I concur in the judgment.

---

**17.** Assuming the applicability of Fed.R.Civ.P. 54(b) to a given federal habeas petition, a district court, of course, retains its discretion to certify a partial disposition of claims for relief as a final judgment under Rule 54(b). *See Mathis v. Zant,* 903 F.2d 1368 (11th Cir.1990); *Blake v. Kemp,* 758 F.2d 523 (11th Cir.), *cert. denied,* 474 U.S. 998, 106 S.Ct. 374, 88 L.Ed.2d 367 (1985). We emphasize, however, that Rule 54(b) certification requires "an express determination that there is no just reason for delay." In determining whether no just reason for delay exists in a given case, a district court should carefully take into account the policy considerations detailed in this opinion. As our discussion clearly demonstrates, we find that these policy considerations may support a Rule 54(b) certification in only the rarest of cases.

We further note that the rule announced in part II of this opinion in no way affects our discretion to remand any habeas case for the disposition of undecided claims, even if that case should not be subject to the rule established in part II because it was decided in the district court prior to the expiration of one hundred and twenty days following the date of this opinion.